862 A.2d 516

Percy Stanley HARRIS

v.

STATE of Maryland.

No. 1268, Sept. Term, 2003.

Court of Special Appeals of Maryland.

Dec. 6, 2004.

Reconsideration Denied Jan. 27, 2005.

80

Mark Gitomer, Owings Mills, for appellant.

Celia Anderson Davis (J. Joseph Curran, Jr., Atty. Gen. on the brief), Baltimore, for appellee.

Panel: KENNEY, DEBORAH S. EYLER, JOHN C. ELDRIDGE (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

The Circuit Court for Prince George's County denied a motion by Percy Stanley Harris to reopen a closed postconviction proceeding, under Maryland Code (2001), section 7–104 of the Criminal Procedure Article ("CP").[1] The issues on appeal are:

---

1. CP section 7–104 is part of the Uniform Postconviction Procedure Act ("UPPA"), which is codified at CP sections 7–101 *et seq.* and Maryland Rules 4–401 *et seq.*

I. Did the circuit court abuse its discretion in denying Harris's motion to reopen his closed postconviction proceeding based on an allegation of ineffective assistance of trial counsel?

II. Did the circuit court abuse its discretion in denying Harris's motion to reopen his closed postconviction proceeding based on allegations of ineffective assistance of postconviction counsel?

For the following reasons, we shall affirm the order of the circuit court.

## FACTS AND PROCEEDINGS

### *Background*

On January 22, 1988, in Sussex County, Virginia, Harris, then 43 years old, was charged with the abduction and attempted murder of Lyndetta Mickles, his 17–year–old girlfriend.[2] Three days later, Federal Bureau of Investigation ("FBI") agents arrested Harris in Baltimore for unlawful flight to avoid prosecution of the Sussex County charges. Upon his arrest, Harris was advised of the charges against him as well as the factual allegations relating to the charges. He then was released on bail.

On February 13, 1988, Harris abducted Lyndetta from a bus stop in Baltimore, took her to a house in the District of Columbia, and beat her to try to force her to write a recantation letter. The police rescued Lyndetta on February 29, 1988. The next day, a Washington, D.C., court issued a warrant for Harris's arrest on kidnapping charges.

---

2. Lyndetta had appeared at Christine and Webster Massenburg's residence in Sussex, Virginia, during the early morning hours of January 22, 1988, badly scratched and bruised and wearing only panties. Police responded to the Massenburg home and took Lyndetta to a hospital for treatment. At the hospital, Lyndetta alleged that earlier that evening Harris had beaten her in his home in Baltimore, Maryland; driven her to a rural road in Sussex County; beaten her until she lost consciousness because she would not perform sexual acts on him; dragged her to a wooded area on the side of the road; and left her there.

Sometime on the night of Sunday, April 10, or in the early morning hours of Monday, April 11, 1988, Lyndetta was murdered. She was last seen leaving her grandmother's home in Baltimore around 6:00 p.m., on April 10. A passerby discovered her body around 1:00 a.m. on April 11, in a secluded area near Watkins Park, in Prince George's County, Maryland. Her wounds were fresh and she was still bleeding. An autopsy revealed that she had been shot in the head and the left shoulder with a .44 caliber pistol. Additionally, a DNA test on semen found inside Lyndetta's body and in her panties revealed the presence of Harris's sperm.

On April 14, 1988, Harris was charged, in the Circuit Court for Prince George's County, with first-degree murder, second-degree murder, and the use of a handgun in the commission of a crime of violence in connection with Lyndetta's killing. A warrant was issued for his arrest.

On May 30, 1988, Harris was apprehended in Uncasville, Connecticut.

The charges against Harris went to trial on May 7, 1990. The trial ended in a hung jury on May 16, 1990. Harris's second trial began on November 1, 1990.

### *November 1990 Trial*

One of the State's witnesses was Viola Mickles, Lyndetta's grandmother. Mickles had testified as a rebuttal witness for the State at Harris's first trial. Her testimony then consisted of explaining that she had received several telephone calls from an unidentified person between February 13 and 29, 1988—the dates during which Harris held Lyndetta in Washington, D.C. At the retrial, however, Mickles was called in the State's case-in-chief and testified that Lyndetta had come to her house for a visit on April 10, the day before her body was found. When the prosecutor asked Mickles what Lyndetta had said during her visit, defense counsel objected because the testimony had not been introduced at the previous trial. A bench conference ensued. The trial court decided to hear

Mickles's testimony out of the presence of the jury and then rule on its admissibility.

Mickles testified that she had seen Lyndetta late in the afternoon on April 10, and that Lyndetta had said she was going to a movie with "Percy"; Harris then picked Lyndetta up in an automobile to go to the movies. Defense counsel objected to all of this testimony, and the trial judge ultimately ruled that Mickles would not be permitted to identify Harris before the jury by pointing to him or using the name "Percy." Mickles would be permitted to give a physical description of the person she had seen in the car, however, and to relate what Lyndetta had said her intentions were that night—to go to the movies with Percy.

The next day, Mickles testified before the jury that Lyndetta had said, on April 10, that "her and Percy was going to the movie." Mickles further testified that, from her bedroom window, she saw Lyndetta get into a "middle-sized car ... dark [in] color" with a "[m]iddle-aged black" man driving.

On cross-examination, defense counsel established that the first time Mickles had seen Harris was when he picked up Lyndetta to take her to the movies that night, and that she had seen Harris since then during the ensuing court proceedings.

FBI Agent Thomas Montgomery testified for the State. He recounted that, on April 13, 1988, acting as part of a fugitive investigation, he went to the home of Flora Holt, Harris's aunt, in Washington, D.C. He told Holt he had a warrant for Harris's arrest for the kidnapping of Lyndetta, and that Prince George's County "police officers [ ] were interested in talking to him about homicide." Agent Montgomery explained that he disclosed Lyndetta's name to Holt as the victim of the kidnapping because the name was written on the arrest warrant. He did not disclose Lyndetta's name as the homicide victim, however, because the murder had occurred in Prince George's County and was being handled by authorities there.

Agent Montgomery further testified that, upon determining that Harris was not at Holt's house, he started to leave. Holt

summoned him back inside, saying that Harris was on the telephone and wanted to speak to him. Agent Montgomery spoke to Harris on the telephone, saying: "Mr. Harris, we have an arrest warrant for you, we'd like to work out some arrangements to take care of this warrant." Harris responded, "What was this about, some homicide," to which Agent Montgomery said, "Well, that's not what I have a warrant for. I have a warrant charging you with kidnapping." To this, Harris replied: "I didn't kill that girl. She was my baby. I wouldn't have hurt her." Harris then agreed to turn himself in to Metropolitan Police Department headquarters in Washington, D.C. the next day. He did not do so, however.

Witnesses for the defense testified that Agent Montgomery indeed had related Lyndetta's name to the homicide. According to one such witness, Agent Montgomery pulled out a picture of Lyndetta and showed it to Holt, identifying the person in it as being the victim of the homicide. Another witness testified that, during Agent Montgomery's telephone conversation with Harris, the agent told Harris he was wanted "because of Lyndetta . . . ."

The trial court gave the jury a flight instruction. Defense counsel objected, arguing:

[I]t's my understanding [that a flight instruction] is normally given if there's some evidence of fugitive flight.

In this case we're dealing with the warrant for murder that was issued by Prince George's County. We're not talking about evidence of flight from any other warrants. The Court will recall the record indicates there was a kidnapping warrant issued out of the District of Columbia on or about March 1st . . . at the time FBI Agent Montgomery went to [Holt's house]. While he was at [Holt's house] he received a telephone call from . . . Harris.

There's no evidence whatsoever where . . . Harris was at the time that telephone call originated. All we have, at the time he was arrested, he was with his brother in Connecticut. There's no indication that he went from a place to a place as the result of anybody being advised, anything being

told to him, concerning possible charges. As a fact, I believe at the time they went to [Holt's house] there wasn't even a warrant for murder issued yet. Prince George's County Police had not issued it yet. They were there to execute a kidnapping warrant and to quote investigate an alleged kidnapping and that was the testimony in the record and I don't think that [a] flight instruction would be appropriate unless the defendant is aware of the fact that there is a warrant for his arrest for a charge and that fact was never communicated to him.

The court explained its reason for giving the flight instruction, stating:

[T]he State adduced evidence that [Agent Montgomery did not] mention [ ] who it was that was deceased [when he went to Holt's house]. If it had laid there, then I would not give an instruction but there were witnesses who took the stand for the defense and put before this jury that indeed [Agent Montgomery] did say it was for Lyndetta and that's why they were looking for him and based upon that I'm going to give the instruction.

The case was sent to the jury for deliberation on November 9, 1990. After a few hours, the jurors sent a note saying that they had reached a verdict on the second-degree murder and handgun charges but were deadlocked on the first-degree murder charge. The court asked defense counsel if he had advised Harris about the situation, to which defense counsel responded:

I have advised my client the jury has reached a verdict on two of the three counts. I have advised him let's go ahead and bring it in so we'll know probably what the verdict is so bring it in. I know we have a right to insist on a verdict on all three counts but I think we'll just take it.

The jury was brought into the courtroom and returned guilty verdicts on the charges of second-degree murder and use of a handgun in the commission of a crime of violence. The judge asked defense counsel whether he wanted to have the jury polled on those counts, and defense counsel respond-

ed in the affirmative. The jurors were polled. The court then asked the jurors whether they thought a consensus as to the first-degree murder charge was reachable, to which the foreman responded, "the consensus was we cannot." The court explained that it could not accept that outcome and directed the jurors to deliberate further, instructing:

> Folks, the verdict must be the considered judgment of each of you. In order to reach a verdict, all of you must agree. Your verdict must be unanimous. You must consult with one another and deliberate with the view to reaching an agreement if you can do so without violence to your individual judgment.
>
> Each of you must decide the case for yourself but do so only after an impartial consideration of the evidence with your fellow jurors.
>
> During deliberations, do not hesitate to re-examine your own views. You should change your opinion if convinced you are wrong, but do not surrender your honest belief as to the weight or effect of the evidence only because of the opinion of your fellow jurors or for the mere purpose of reaching a verdict.
>
> What I have said to you, folks, is that take a look at the evidence. Don't be afraid to change your own view, but only if you feel that your view is an erroneous one. What I'm telling you further is that both sides deserve a resolution of that particular count. Please go back and work hard like you have been working and try again and thank you for the job you have done so far.
>
> You may now retire, folks.

Defense counsel objected to the court's instruction on the ground that it was an impermissible "*Allen* charge." [3] He did not object to the court's decision to have the jury continue deliberating on the first-degree murder charge, after having returned a guilty verdict for second-degree murder.

---

**3.** *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

After further deliberations, the jury returned a verdict of guilty of first-degree murder. The jurors were polled, hearkened to their verdict, and discharged.

On January 8, 1991, Harris was sentenced to life imprisonment for the first-degree murder conviction and a consecutive 20 years imprisonment for the handgun conviction. The second-degree murder conviction was merged.

### *Direct Appeal*

Harris pursued an appeal in this Court. He raised three issues:

[w]hether the trial court propounded an incorrect and coercive *Allen* charge ...; [w]hether the trial court erred in propounding a flight instruction; [and] [w]hether the trial court erred in its instructions ... [about the] use of a handgun in the commission of a crime of violence.

On January 8, 1992, this Court filed an unreported *per curiam* opinion affirming the judgments. *Harris v. State,* No. 362, September Term 1991 (filed January 8, 1992). We held that the *Allen*-type charge given by the trial court was "perfectly acceptable" and "closely adhered to ABA-recommended language" approved by the Court of Appeals in *Kelly v. State,* 270 Md. 139, 310 A.2d 538 (1973). Slip op. at 11. Noting that it was "entirely reasonable that a jury, by relying solely on the circumstantial evidence presented, could doubt the coincidence of the fact that Harris suddenly should seek shelter in another state several hundred miles away from his usual area of abode[,]" we concluded that there was sufficient circumstantial evidence in the record to generate an instruction on flight.[4] Slip op. at 16.

---

4. We further noted that "[t]here was evidence that Harris drove a car with Maryland plates; that, in the months immediately preceding the murder, he had lived either with his brother in Baltimore or his aunt in Washington; that Harris knew police wanted to question him about the Mickles murder; and that, at the time of his arrest, he had moved to Connecticut." Slip op. at 15.

On February 17, 1992, our mandate issued. Thereafter, Harris filed a petition for writ of *certiorari*, which the Court of Appeals denied on April 24, 1992. *Harris v. State*, 326 Md. 365, 605 A.2d 101 (1992).

### Post Conviction Proceeding

On March 12, 1997, Harris filed a petition for postconviction relief under the UPPA, which, at the time, was codified at Maryland Code (1957, 1992 Repl.Vol., with amendments effective November 1, 1995), Article 27, sections 645A through 645J.[5] He requested a hearing, a new trial, and costs of the proceeding. He set forth three "claims": due process errors by the trial court affecting "fundamental rights" that he did not "intelligently and knowingly" waive; ineffective assistance of trial counsel; and ineffective assistance of appellate counsel.

Harris's due process claim was three-fold. First, he alleged that the trial court used "Improper Procedure[ ]" to obtain the guilty verdict for first-degree murder because, when the jury returned a guilty verdict for second-degree murder, that verdict was final, accepted by all parties, and obtained in accordance with Maryland Rule 4–327(a) and (e), and, as such, amounted to an "implied acquittal" on the first-degree murder charge. The subsequent guilty verdict on the first-degree murder charge therefore violated his constitutional right not to be placed in double jeopardy, which he had not "intelligently and knowingly waived" in a prior proceeding. Relatedly, Harris alleged that the trial court had erred by allowing the jury to deliberate on the first-degree murder charge after being polled on its verdict of guilty of second-degree murder, noting that "[a] verdict is final when a jury is polled." This involved a fundamental right that he had not "intelligently and knowingly waived."

Second, Harris alleged that the trial court's instruction on "reasonable doubt" had reduced the State's burden of proof below the "beyond a reasonable doubt" standard, violating his

---

**5.** Article 27, sections 645A through 645J were recodified at CP sections 7–101 *et seq.*, effective October 1, 2002.

fundamental right to the presumption of innocence, which he also had not knowingly and intelligently waived. Finally, Harris alleged that the trial court had committed plain error by not striking statements by the prosecutor in closing argument expressing a belief that the State's witnesses were credible and suggesting defense counsel had purposely misled the jury during trial.

Harris's ineffective assistance of trial counsel claim rested on seven grounds. Most significantly, he alleged that trial counsel had performed deficiently by "open[ing] the door," on cross-examination of Mickles, so as to have her identify him as the man who came to pick up Lyndetta in a dark car on Sunday, April 10, 1988. Trial counsel's questions elicited damaging evidence that Harris was the last person seen with Lyndetta before her murder-after trial counsel had successfully convinced the court to preclude Mickles from identifying Harris as the man Lyndetta got into the car with and from referring to him as "Percy." [6]

Finally, Harris's claim of ineffective assistance of appellate counsel rested on nine grounds. Most significantly, he alleged that appellate counsel had performed deficiently by not raising the double jeopardy issue on direct appeal.[7]

---

**6.** Harris's six other ineffectiveness claims included: failing to object when the Deputy Sheriff of Sussex County, Virginia testified that Harris was in jail in February of 1988, thereby allowing improper negative character evidence to go to the jury; failing to object when Agent Montgomery testified that Harris had agreed to turn himself in, which constituted an "indirect comment on [Harris's] right to remain silent in the face of accusations;" failing to object to the admissibility of the arrest warrant for kidnapping, thereby allowing the jury to consider inadmissible "other crimes" evidence; failing to object to the State's comments in opening and closing remarks regarding Harris's other crimes, thereby allowing the jury to consider inadmissible "other crimes" evidence; failing to object to the court's faulty reasonable doubt instruction, thereby depriving Harris of the right of presumed innocence; failing to object to the court's decision to allow the jury to deliberate on the first-degree murder charge after it had already been polled as to the guilty verdict on the second-degree murder charge, thereby violating Harris's right not to be placed in double jeopardy.

**7.** Harris also alleged, with minimal elaboration, that his appellate counsel was ineffective because he failed to raise, as plain error, the

On April 2, 1997, the State filed an opposition to Harris's petition for postconviction relief, a memorandum of law in support, and attached portions of the trial transcript.

The postconviction court held an evidentiary hearing on June 20, 1997.

On June 26, 1997, Harris filed a supplemental memorandum to his petition for postconviction relief. In it, he emphasized that the trial court's "agreement" with trial counsel and Harris to accept a partial verdict barred further deliberation on the first-degree murder charge; and that, by allowing the jury to further deliberate on that charge, the trial court "breached its agreement" with trial counsel. On this logic, the jury's guilty verdict on the second-degree murder charge was an "implied acquittal" and therefore allowing it to consider the first-degree murder charge was improper. Additionally, Harris reasserted that the trial court's reasonable doubt instruction was defective under federal constitutional law.

On July 10, 1997, Harris filed a second supplemental memorandum, addressing the State's opposition to his petition. Harris attacked the State's argument that *State v. Griffiths*, 338 Md. 485, 659 A.2d 876 (1995), supported the proposition that "a retrial for a greater offense after a hung jury is not prohibited under Maryland law when the jury convicts on a

---

trial court's improper reasonable doubt instruction; failed to raise, as plain error, the trial court's ruling at trial, over defense objection, excluding Lyndetta's school records, which were admissible for impeachment purposes; failed to raise, as plain error, the trial court's decision to allow the State to introduce rebuttal evidence at trial of a postcard allegedly mailed to Harris by Lyndetta; failed to raise, as plain error, improper and prejudicial statements the prosecutor made in opening and closing arguments; failed to raise, as plain error, admission into evidence testimony that Harris was in jail in February of 1988 for another unadjudicated crime; failed to raise, as plain error, that testimony that Harris had said he would surrender was an "indirect comment" on Harris's right to remain silent; failed to raise, as plain error, the trial court's decision to allow the State, over defense objection, to reopen its case and allow Lyndetta's mother to testify that Lyndetta was present at a Virginia court for her kidnapping proceedings; failed to raise, as plain error, the trial court's decision to allow into evidence the arrest warrant for kidnapping in Washington, D.C.

lesser included offense and is hung on the greater offense." He argued that his case was different than *Griffiths* because the parties had agreed not to wait for a verdict on the first-degree murder charge when they decided to accept the jury's decision on the other charges. He cited his trial counsel's statement, "I know we have a right to insist on a verdict on all three counts but I think we'll just take it," and the trial court's response, "Very well sir. With that understanding on the record, let's bring them in," as evidence that there was an agreement not to allow the jury to deliberate on the remaining count.

On September 5, 1997, the postconviction court issued a memorandum opinion and order denying Harris's petition for postconviction relief. The court noted that, under the UPPA, Harris was required to prove that he had not waived "any alleged grounds for [ ] relief" and to allege errors that had not been "previously and finally litigated." The postconviction court explained that, with respect to fundamental rights, "waiver" in the postconviction context means "intelligently and knowingly failing to make such allegations before trial, at trial or on direct appeal, unless the failure is excused because of 'special circumstances.'" After characterizing Harris's claims of trial court error as alleged due process violations, the court found that Harris had "done little or nothing" to rebut the presumption that he had waived those grounds for relief and had not demonstrated any "special circumstances" for why he had failed to pursue the alleged instances of trial court error on direct appeal.

With regard to the ineffective assistance of trial and appellate counsel claims, the postconviction court explained that, under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Harris had the burden of showing that counsel performed deficiently and that the deficient performance prejudiced him. The court then rejected Harris's ineffective assistance arguments as without merit. Most significantly, it found that trial counsel had not performed deficiently by asking Mickles to identify Harris in court, after successfully obtaining a ruling precluding the State from

doing the same, saying that "no persuasive evidence, reasons or authority demonstrating error" were shown. The court also found that the record did not show any agreement between the parties and the trial court that, upon taking the verdict on second-degree murder and the handgun charge, the jury deliberations would end.[8]

On September 26, 1997, Harris filed in this Court an application for leave to appeal the postconviction order. This Court denied the application on January 14, 1998.

### *Motion to Reopen Post Conviction Proceeding*

On September 20, 2002, Harris filed a motion to reopen the postconviction proceeding under CP section 7–102 and requested a hearing under CP section 7–108(b)(1). In his supporting memorandum of law, he argued that it was "in the interests of justice" to reopen the proceeding because he had been denied effective assistance of counsel at the trial, appellate, and postconviction proceedings; and that, upon reopening the proceeding, "in the interests of justice," the postconviction court should vacate his conviction and remand the case for a new trial.

In addition to making the same ineffectiveness arguments raised against trial and appellate counsel in his 1997 petition for postconviction relief, Harris argued that his postconviction counsel was ineffective for failing to criticize trial counsel for not objecting to the flight instruction, when there was evidence that Harris might have fled the jurisdiction because of the kidnapping and not the murder charge; and for failing to criticize appellate counsel for not challenging on appeal Mickles's "suggestive identification" of him at trial. Additionally, Harris alleged that his postconviction counsel was ineffective because he did not sufficiently plead the "prejudice prong" of the ineffectiveness claim.

---

**8.** The trial court summarily stated that Harris's remaining nine claims of ineffective assistance of counsel were not supported by "persuasive evidence, reasons or authority demonstrating error" and found them all without merit.

On March 19, 2003, the State filed an opposition to the motion to reopen, arguing that Harris had not shown that it was "in the interests of justice" to reopen the closed postconviction proceedings. With regard to the flight instruction, the State argued, *inter alia*, that there was ample evidence in the record for the jury to infer that, when Harris fled, he knew he was or would be charged with Lyndetta's murder. In response to Harris's allegation that his postconviction counsel had failed to plead prejudice, under *Strickland*, the State pointed to the petition for postconviction relief, which in fact pleaded prejudice.

Finally, as to the impropriety *vel non* of the trial court's decision to allow the jury to continue to deliberate the first-degree murder charge after it rendered guilty verdicts on the second-degree murder and the handgun charges, the State argued that the issue had been fully and fairly litigated "in excruciating detail" (including in this Court's unreported opinion discussed above), and thus was waived.

On April 17, 2003, Harris wrote a letter to the court, responding to the State's opposition and arguing that the issue of whether it was proper for the jury to continue deliberating on the first-degree murder charge had not been fully and fairly litigated. He argued, *inter alia*, that, under *Hoffert v. State*, 319 Md. 377, 572 A.2d 536 (1990), "[o]nce a jury's verdict is established as unanimous, whether by hearkening or polling ... [t]he case is no longer within the province of the jury, and its verdict is final."

On April 30, 2003, the court issued a "Memorandum and Order" denying Harris's motion to reopen, without a hearing. The court briefly recounted the procedural history of the case. After explaining that it has discretion under the UPPA to reopen a postconviction proceeding upon determining that to do so would be "in the interests of justice," the court concluded that Harris's motion to reopen was without merit.

On May 29, 2003, Harris filed a motion for reconsideration, alleging that the trial court should reconsider its decision because it had summarily denied Harris's motion to reopen

closed postconviction proceedings without issuing an opinion or statement on the record discussing Harris's specific arguments individually.

On June 5, 2003, the court denied Harris's motion for reconsideration.

On July 7, 2003, Harris filed an application for leave to appeal, which was granted on October 24, 2003.

## STANDARD OF REVIEW

We review a circuit court's denial of a motion to reopen a closed postconviction proceeding for abuse of discretion. *Gray v. State*, 158 Md.App. 635, 648, 857 A.2d 1176 (2004) (concluding that the circuit court did not "abuse its discretion by refusing to reopen the postconviction proceeding"); *see also* CP § 7–104 (stating that a court "may reopen a postconviction proceeding" if the court determines, in exercising its discretion, that the action is "in the interests of justice").

## DISCUSSION

The UPPA applies to persons "confined under sentence of death or imprisonment" or "on parole or probation." CP § 7–101. Generally, such a person may file a petition for postconviction relief for up to ten years after a sentence is imposed,[9] if he alleges:

(1)the sentence or judgment was imposed in violation of the Constitution of the United States or the Constitution or laws of the State;

(2)the court lacked jurisdiction to impose the sentence;

(3)the sentence exceeds the maximum allowed by law; or

(4)the sentence is otherwise subject to collateral attack on a ground of alleged error that would otherwise be available

---

9. In a case in which a sentence of death has not been imposed, and it has been more than ten years since the sentence was imposed, a person cannot file a petition for postconviction relief "[u]nless extraordinary cause is shown." CP § 7–103(b)(1).

under a writ of habeas corpus, writ of coram nobis, or other common law or statutory remedy.

CP § 7–102(a).

In addition to these requirements, to file a petition for postconviction relief, a person also must be seeking to set aside or correct a judgment or sentence, and the error alleged regarding the judgment or sentence must not have been "previously and finally litigated or waived" in the proceeding resulting in the conviction, or in any other subsequent proceeding in which the person sought relief from his conviction. CP § 7–102(b).

A petition for postconviction relief must include, among other things, the allegations of error, a statement of facts supporting the allegations of error, a statement of facts demonstrating that the petitioner never waived the allegations of error, and the type of relief sought. Md. Rule 4–402(a).

A person may file but one petition for postconviction relief for each trial or sentence.[10] CP § 7–103(a). However, a circuit court may reopen a closed postconviction proceeding upon determining that doing so is "in the interests of justice." CP § 7–104.

■ As a matter of right, a person filing a petition for postconviction relief is entitled to a hearing and the assistance of counsel. CP § 7–108(a); Md. Rule 4–406(a). There is no entitlement to have a closed postconviction proceeding reopened unless the petitioner asserts facts that, "if proven to be true at a subsequent hearing[,] establish that postconviction relief would have been granted but for the ineffective assis-

---

**10.** When the UPPA was enacted in 1958, it placed no limit on the number of postconviction petitions that a person could file. *Mason v. State,* 309 Md. 215, 217–18, 522 A.2d 1344 (1987). In 1986, the General Assembly amended the UPPA to provide that only two petitions for postconviction relief may be filed arising out of each trial. *Grayson v. State,* 354 Md. 1, 3, 728 A.2d 1280 (1999). In 1995, the General Assembly reduced the number of petitions for postconviction relief that a person may file for a particular trial to one. *Id.* at 4, 728 A.2d 1280.

tance of ... postconviction counsel." *Stovall v. State,* 144
Md.App. 711, 716, 800 A.2d 31 (2002); *see also* CP § 7–104.

▇▇▇ The UPPA was created in part to provide a forum
for litigating ineffective assistance of counsel claims. *Harris
v. State,* 299 Md. 511, 517, 474 A.2d 890 (1984). The Sixth
Amendment to the United States Constitution guarantees all
criminal defendants the right to the assistance of counsel.
*Strickland, supra,* 466 U.S. at 684–85, 104 S.Ct. 2052. Fur-
thermore, "the right to counsel is the right to the effective
assistance of counsel." *McMann v. Richardson,* 397 U.S. 759,
771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *see also
Mosley v. State,* 378 Md. 548, 557, 836 A.2d 678 (2003)
("Integral to [the right to counsel under Maryland law] is the
right to effective assistance of counsel.").

▇▇▇ The right to effective assistance of counsel applies even
when the right arises under statutory law. *Evitts v. Lucey,*
469 U.S. 387, 401, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985); *State
v. Flansburg,* 345 Md. 694, 703, 694 A.2d 462 (1997)("Regard-
less of the source, the right to counsel means the right to the
effective assistance of counsel."); *see also Stovall, supra,* 144
Md.App. at 715, 800 A.2d 31 (holding that a postconviction
petitioner has a right to effective assistance of postconviction
counsel).

In Maryland, courts must apply the standard announced in
*Strickland, supra,* to determine whether counsel's representa-
tion comported with the requirements of the Sixth Amend-
ment. *Gross v. State,* 371 Md. 334, 348, 809 A.2d 627 (2002).
To prevail on an ineffective assistance of counsel claim, a
petitioner must satisfy a two-pronged test: he must demon-
strate that his counsel's performance was deficient and that he
was prejudiced by the deficient performance. *Strickland,
supra,* 466 U.S. at 687, 104 S.Ct. 2052; *Mosley, supra,* 378
Md. at 557, 836 A.2d 678; *State v. Peterson,* 158 Md.App. 558,
583, 857 A.2d 1132 (2004).

To prove the performance prong of the *Strickland* standard,
the petitioner must show that counsel's representation "fell
below an objective standard of reasonableness," *Wiggins v.*

*Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting *Strickland, supra,* 466 U.S. at 688, 104 S.Ct. 2052), as measured by "prevailing professional norms." *Id.; Mosley, supra,* 378 Md. at 557, 836 A.2d 678. Until a petition-er proves otherwise, the court presumes counsel's representa-tion was professionally competent and "derived not from error but from trial strategy." *Peterson, supra,* 158 Md.App. at 584, 857 A.2d 1132 (quoting *Mosley, supra,* 378 Md. at 558, 836 A.2d 678).

In *Strickland,* the Supreme Court held that, in situations in which prejudice is not presumed, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. 2052. *See also Holland v. Jackson,* —— U.S. ——, 124 S.Ct. 2736, 2738, 159 L.Ed.2d 683 (2004) (same). Our Court of Appeals has held that the *Strickland* prejudice standard aptly can be described as whether there was a "substantial or significant possibility that the verdict of the trier of fact would have been affected." *Bowers v. State,* 320 Md. 416, 427, 578 A.2d 734 (1990). *See also Oken v. State,* 343 Md. 256, 284, 681 A.2d 30 (1996) (stating that the defendant "must show that there is a substantial possibility that, but for counsel's unprofessional errors, the result of the proceeding would have been different"); *Williams v. State,* 326 Md. 367, 373–74, 605 A.2d 103 (1992) (same).

With that legal background, we turn to Harris's contentions.

## I.

■■ Harris first contends that the postconviction court abused its discretion in denying his motion to reopen based on ineffective assistance of trial counsel. He argues that his trial counsel performed deficiently, to his prejudice, by not objecting when the trial court directed the jury to continue deliberating on the first-degree murder charge after the court

accepted verdicts of guilty of second-degree murder and handgun charges, and polled the jury on those verdicts.

This contention only can have merit if Harris's double jeopardy argument has merit, which it does not.

The Fifth Amendment to the United States Constitution protects persons from being "subject for the same offence to be twice put in jeopardy for life or limb." The right extends to the States by application of the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *State v. Woodson*, 338 Md. 322, 327–28, 658 A.2d 272 (1995). Maryland common law also prohibits double jeopardy for the same crime. *Smith v. State*, 299 Md. 158, 163 n. 2, 472 A.2d 988 (1984). Specifically, in Maryland, once the "jury or the judge[ ] intentionally renders a verdict of 'not guilty,' the verdict is final, and the defendant cannot later be retried on or found guilty of the same charge." *Id.* at 163, 472 A.2d 988 (quoting *Pugh v. State*, 271 Md. 701, 706, 319 A.2d 542 (1974)).

One of the essential characteristics of a final verdict is unanimity. Md. Const. art. 21 ("That in all criminal prosecutions, every man hath a right ... to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty."). *See also Ford v. State*, 12 Md. 514, 549 (1859) (noting that unanimity is "indispensable to the sufficiency of the verdict"). Also, before a verdict is final, a jury must either be hearkened or polled. *Smith, supra*, 299 Md. at 168, 472 A.2d 988 (citing *Givens v. State*, 76 Md. 485, 487, 25 A. 689 (1893)). A defendant has the absolute right to poll the jury, and polling is a "fully commensurable substitute for hearkening." *Ross v. State*, 24 Md.App. 246, 254, 330 A.2d 507 (1975), *rev'd on other grounds*, 276 Md. 664, 350 A.2d 680 (1976).[11]

---

11. In *Ross v. State, supra,* 24 Md.App. at 252, 330 A.2d 507, we explained the process of hearkening the verdict as

"[b]y the common-law procedure, ... the verdict of the jury was orally pronounced in open court, then recorded by the clerk, and affirmed by the jury, which was done by that officer saying to them to

 "While the case is still within the province of the jury, the court may permit them to reconsider and correct the verdict, provided nothing be done amounting to coercion or tending to influence conviction or acquittal." *Smith, supra,* 299 Md. at 168, 472 A.2d 988. When "the verdicts of the jury are not complete, and the jury is still under the aegis of the court, the jury may resume its deliberation to resolve the verdicts required to be rendered." *Hoffert v. State,* 319 Md. 377, 387 n. 3, 572 A.2d 536 (1990).

Subsection (d) of Rule 4–327 governs the procedure for partial verdicts in criminal cases:

**Two or more counts.** When there are two or more counts, the jury may return a verdict with respect to a count as to which it has agreed, and any count as to which the jury cannot agree may be tried again.

Subsection (e) of that rule governs polling:

**Poll of jury.** On request of a party or on the court's own initiative, the jury shall be polled after it has returned a verdict and before it is discharged. If the jurors do not unanimously concur in the verdict, the court may direct the jury to retire for further deliberation, or may discharge the jury if satisfied that a unanimous verdict cannot be reached.

Harris's double jeopardy argument rests on the concept that he was impliedly acquitted of first-degree murder when the jury rendered its verdicts of guilt on the second-degree murder and handgun charges and was polled; and therefore his conviction of first-degree murder was for a crime for which he had been acquitted. Harris bases his assertion that he was impliedly acquitted of first-degree murder on *Green v. United States,* 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); on his

hearken to their verdict as recorded by the court, and repeating to them what had been taken down for the record."
(Citation omitted.) While courts in Maryland have not adopted a particular procedure for hearkening and there is no reference in the Maryland Rules about hearkening, the process generally requires the jurors to assent to the verdict in the manner in which it was stated by the foreman and accepted by the Court. *Glickman v. State,* 190 Md. 516, 527, 60 A.2d 216 (1948).

reading of subsections (d) and (e) of Rule 4–327; and on *State v. Knight,* 143 Wis.2d 408, 421 N.W.2d 847 (1988).

In *Green v. United States,* the defendant was indicted on two counts: 1) arson; and 2) causing the death of a woman by the alleged arson which, if true, amounted to first degree murder. At the close of the evidence at trial, the court instructed the jury that it could find Green "guilty of arson under the first count *and of either* (1) first-degree murder *or* (2) second-degree murder under the second count," even though the prosecutor had not charged Green with second-degree murder under the second count. 355 U.S. at 185, 78 S.Ct. 221 (emphasis added). The jury returned a verdict of guilty of arson and second-degree murder; it was silent on the first-degree murder charge. The trial court accepted the verdict and dismissed the jury. After he was sentenced, Green appealed the second-degree murder conviction. The United States Court of Appeals for the District of Columbia reversed, on the ground that the trial court erred by instructing the jury on second-degree murder.[12] On remand, Green was retried for first-degree murder, under the original indictment. He was found guilty of that crime and sentenced to death. On appeal, the judgment was affirmed.

The Supreme Court granted *certiorari* and reversed the conviction on double jeopardy grounds. Emphasizing that, at the first trial, the jury was instructed that it could find Green guilty of first-degree murder (felony murder theory) *or* second-degree murder, the Court concluded that, in that circumstance, the guilty verdict for second-degree murder was an "implicit acquittal" on the first-degree murder charge. *Id.* at 190, 78 S.Ct. 221. The Court observed that, because "the jury was dismissed without returning any express verdict on [the

---

12. The United States Court of Appeals for the District of Columbia Circuit concluded that all the testimony as to what occurred in the case pointed to first-degree murder, "and nothing else." *Green v. United States,* 218 F.2d 856, 859 (D.C.Cir.1955). The Court found that there was no reason for the trial court to give a second-degree murder instruction and determined that doing so was reversible error, entitling Green to a new trial.

first-degree murder] charge and without Green's consent .... [even though] it was given a full opportunity to return a verdict and no extraordinary circumstances appeared which prevented it from doing so[,]" the circumstances were no different than if the jury had returned a verdict expressly stating: "We find the defendant not guilty of murder in the first degree but guilty of murder in the second degree." *Id.* at 191, 78 S.Ct. 221. Accordingly, Green could not be retried for first-degree murder because his "jeopardy for first degree murder came to an end when the jury was discharged." *Id.*

■■■ There are crucial distinctions between this case and *Green.* In *Green,* the acquittal on the first-degree murder charge was implied from the jury's silence on that charge when they rendered guilty verdicts on the second-degree murder charge and then were discharged. In the case at bar, in contrast, the jury was not silent about the first-degree murder charge. Rather, when the jurors were convened to deliver their verdicts, the foreman said they had reached an agreement on the second-degree murder and handgun charges, but had not reached an agreement on the first-degree murder charge. From this statement, one cannot imply a unanimous verdict of acquittal, as Harris urges. Also, in *Green,* the jurors were told that they could convict Green of either second-degree murder **or** first-degree murder. Thus, silence on the first-degree murder charge in the face of a guilty verdict on the second-degree murder charge connoted a choice not to convict of first-degree murder. In Harris's trial, the jury was not so instructed and was free to return a verdict on the first-degree murder **and** second-degree murder charges.[13]

---

**13.** In Maryland, a jury may return guilty verdicts for both greater and lesser-included offenses. *See Snowden v. State,* 321 Md. 612, 617, 583 A.2d 1056 (1991). It is only in the sentencing phase of the trial that a lesser-included offense will merge into the greater offense. *Id.* Furthermore, in *Griffiths, supra,* the Court of Appeals held that, when, in a multi-count indictment, a defendant was found guilty of a lesser-included offense but there was a mistrial on the greater offense, double

There also is no merit to Harris's argument based on Rule 4–327(d) and (e). He reads those subsections to mean that, once the jury rendered verdicts on two counts and was polled on those verdicts, it was prohibited from further deliberation, with the result that he was automatically acquitted of the remaining first-degree murder count. This analysis is contrary to the plain language of the subsections, however.

Under subsection (d), the jury may return a verdict on a count as to which it has agreed, and any count "to which the jury cannot agree may be tried again." Here, the jury returned verdicts on two counts on which the jurors agreed—a partial verdict. The jurors stated that they could not agree on the remaining first-degree murder count, but the court, thinking they were not hopelessly deadlocked, gave them an *Allen* charge and had them deliberate further; they then reached a verdict on that count. Subsection (d) did not preclude the jury from deliberating further on the undecided count any more than it would have precluded a retrial on that count, had the jurors been unable to unanimously decide it.

Furthermore, there is nothing in subsection (e) to suggest that polling the jury on its second-degree murder and handgun charge verdicts worked an acquittal on the undecided first-degree murder charge. That subsection permits the court to retire the jury for further deliberations if a poll taken on a verdict discloses that the verdict is not unanimous. For example, if, during the poll on the second-degree murder charge, one of the jurors had said his verdict was not guilty, the court could have retired the jury to further deliberate on that count.

Subsection (e) does not prohibit a court from directing jurors to further deliberate on a count on which they are in disagreement after returning a verdict on a count on which they have agreed; and it certainly does not effect an automatic acquittal on the remaining count. Indeed, any such reading

jeopardy principles were not offended when the defendant was later retried on the greater offense.

of subsection (e) would be inconsistent with subsection (d). If polling a jury on decided counts worked an acquittal on a remaining count over which the jury was in disagreement, there could not be a retrial of the remaining count, even after a hopeless deadlock on it.

*State v. Knight* does not support Harris's double jeopardy argument either. In that case, Knight and a codefendant were charged with robbery, endangering safety by conduct regardless of life, and false imprisonment. After 14 hours of deliberations, the jurors sent a note to the judge saying they were unable to reach a unanimous decision on the two robbery charges (one for each defendant). The parties agreed to accept the jury's verdicts without further deliberation. When the jury was brought out, a juror informed the court that it was "deadlocked" as to the robbery counts and they "did not want any more time to deliberate" because more time would not help them reach verdicts on those counts. 143 Wis.2d at 412, 421 N.W.2d 847. The court took the verdicts on the decided counts, which were that both defendants were guilty of endangering safety and false imprisonment. The judge then gave an *Allen* charge and retired the jurors to deliberate on the robbery charges. They returned with guilty verdicts later that day.

The Supreme Court of Wisconsin reversed Knight's robbery conviction. It held that, because in taking the verdicts on the endangering safety and false imprisonment counts, the court did not "indicate . . . that it was accepting only [the] verdicts that the jury had agreed upon[,]" the court "effectively accepted" the two verdicts *and* the deadlock. *Id.* at 417–18, 421 N.W.2d 847. Accordingly, the trial court should have declared a mistrial on the robbery count, due to the deadlock, and not retired the jury to deliberate further, that being an "inva[sion of] the province of the jury." *Id.* at 418, 421 N.W.2d 847.

Clearly, the *Knight* case did not concern double jeopardy principles and was not decided on that issue. The *Knight* court did not hold that a partial verdict worked an implied acquittal on the remaining count, as Harris argues. Rather, it

held that acceptance by the court of a deadlock on one count as the jury's final verdict on that count required a mistrial on that count—not an acquittal. The holding in *Knight* did not preclude a retrial of the robbery charge.

We note, moreover, that the facts in the *Knight* case were unlike those in the case at bar. Here, the jury deliberated for only a few hours and did not make an emphatic statement that further deliberations on the first-degree murder count would be fruitless. Furthermore, the trial court did not accept a deadlock on the first-degree murder count as the jury's final verdict on that count. The trial court accepted a partial verdict on the second-degree murder and handgun charges, under circumstances that made plain that that was what was happening and, upon giving an *Allen* charge, retired the jury for further deliberation on the first-degree murder count. Whether the trial court acted properly in doing so, including whether its actions invaded the province of the jury—the issue in common with *Knight*—already was decided by this Court on direct appeal, adversely to Harris.

As noted above, trial counsel objected to the *Allen* charge, and thus properly preserved for review the issue of whether the court erred in directing further deliberation on the first-degree murder charge. Trial counsel did not interpose an objection based on double jeopardy. For the reasons we have explained, that was not deficient performance. The jury had reached unanimous verdicts on the second-degree murder and handgun charge counts, and the taking of a partial verdict on those counts was permitted by Rule 4–327(d). The jury was not silent on the first-degree murder count; rather, it told the judge it could not agree on that count. Accordingly, there was not an implied acquittal. Also, polling the jury under 4–327(e) on the two counts on which it rendered a verdict did not work an implied acquittal on the remaining count. Harris thus was not in the position of being tried again for an offense he had been acquitted of, and an objection on that ground was not warranted and ultimately would have proven fruitless.

Because there is no merit to Harris's ineffective assistance of trial counsel claim, the postconviction court did not abuse its discretion in denying his motion to reopen the postconviction proceeding to hear that claim.[14]

## II.

We next consider whether the trial court abused its discretion in declining to reopen Harris's closed postconviction proceeding to hear his claims of ineffective assistance of postconviction counsel. Harris makes four arguments in this respect.

### A. Flight Instruction

Generally, evidence of flight following a crime is admissible to show consciousness of guilt. *Sorrell v. State*, 315 Md. 224, 227, 554 A.2d 352 (1989).

Harris maintains that appellate counsel should have argued on direct appeal that there was insufficient evidence to connect his flight to Lyndetta's murder. Therefore, he contends, the trial court should have reopened the postconviction proceeding to hear his claim that, in 1997, postconviction counsel performed deficiently by not criticizing appellate counsel's handling of the flight instruction on direct appeal.

On direct appeal, Harris's appellate counsel raised the issue of "[w]hether the trial court erred in propounding a flight instruction [at Harris's trial]." We decided the issue by determining whether the evidence had generated the flight instruction. Holding that it had, we explained:

[T]he circumstantial evidence was sufficient to generate an instruction as to flight. There was evidence that Harris drove a car with Maryland plates; that in the months immediately preceding the murder, he had lived either with

---

14. As noted above, Harris's argument that the trial court and counsel agreed to accept only the second-degree murder and handgun charge verdicts as the final verdicts in the case was addressed and rejected, on the facts, in the 1997 postconviction decision. We agree that the record does not support Harris's assertion that any such agreement was reached.

his brother in Baltimore or his aunt in Washington; *that Harris knew the police wanted to question him about the Mickles murder;* and that, at the time of his arrest, he had moved to Connecticut. We find that sufficient evidence of flight was presented to support a jury instruction ...

Slip op. at 15 (emphasis added). We also noted that, in deciding to give the flight instruction, the trial court pointed out that witnesses had testified that Agent Montgomery in fact had connected Lyndetta's name to the homicide being investigated, both while talking to Holt in person—immediately before Holt spoke to Harris on the telephone—and while talking to Harris on the telephone.

It is evident, then, from our opinion in this case on direct appeal, that appellate counsel raised the issue of whether the flight instruction was generated by the evidence and, in deciding the issue, this Court took into account that there was evidence connecting Harris's flight to his knowledge that Lyndetta had been murdered. Thus, the issue Harris now faults appellate counsel for not raising on direct appeal in fact was raised and decided on direct appeal.

That being the case, postconviction counsel could not have performed deficiently by failing to criticize appellate counsel on this issue; and the postconviction court therefore did not abuse its discretion in declining to reopen the proceedings to hear a claim based on the issue.

### B. Alleged In-court Identification

Harris next contends that the postconviction proceeding should have been reopened to hear his claim that postconviction counsel was ineffective for failing to criticize appellate counsel for not challenging on direct appeal Mickles's "suggestive identification" of Harris. Harris maintains that Mickles's trial testimony was tantamount to an unduly suggestive in-court identification that created a substantial likelihood of misidentification, and therefore violated his due process rights.

We conclude, upon examining the record, that nothing in Mickles's testimony at all resembled an improper in-court

identification of Harris. After hearing Mickles's testimony out of the presence of the jury, the court ruled that she could testify that, on April 10, Lyndetta said she intended to go to the movies with "Percy" and she could describe the driver of the car that Lyndetta got in later that night. The court ruled that Mickles could not point to Harris at trial or otherwise use the name "Percy." In her ensuing trial testimony, in answer to questions by the prosecutor, Mickles adhered to the court's restrictions. She did not make an in-court identification of Harris.

On cross-examination by defense counsel, in response to a leading question, Mickles said that the first time she saw Harris was when he came to get Lyndetta on April 10, 1988; and that she had seen him since in the ensuing court proceedings. This testimony also was not an in-court identification of Harris, much less a suggestive one carrying a substantial likelihood of misidentification.

There was no due process violation with respect to Mickles's testimony, and therefore postconviction counsel did not render ineffective assistance for not criticizing appellate counsel for not raising this issue on direct appeal.[15] For that reason, the postconviction court did not abuse its discretion in refusing to reopen the postconviction proceeding to hear this issue.

### C. Ineffective Assistance of Postconviction Counsel in Pleading Waiver and Prejudice in the Postconviction Petition

Harris next contends that the postconviction court should have reopened his closed postconviction proceeding so he could show that postconviction counsel was ineffective by not properly pleading Harris's postconviction petition, in two respects: counsel did not allege non-waiver by Harris of several

---

**15.** We further note that the real substance of this issue was addressed by the postconviction court when it denied relief to Harris in 1997. There, Harris alleged that trial counsel was ineffective for "open[ing] the door" on cross-examination to allow Mickles to identify Harris. In that challenge, the postconviction court found that trial counsel had **not** performed deficiently.

fundamental rights implicated in numerous due process violations at trial; and counsel did not properly plead the prejudice prong of *Strickland.*

Although in his questions presented, Harris asserts a pleading failure by postconviction counsel, his argument on this question slips back and forth between assertions of inadequate pleading and inadequate proof, as if the two are the same. Clearly, they are not. Because Harris makes both assertions, we shall address them both.

### 1. Waiver of Fundamental Rights

Another purpose of the UPPA is to afford a convicted person a forum in which to pursue relief for due process violations that occurred at trial and implicated a fundamental right that was not previously litigated or waived. *See* CP §§ 7–102(b) and 7–106(b); *Jackson v. Warden of the Md. Penitentiary,* 236 Md. 634, 635, 204 A.2d 566 (1964). The burden is on the petitioner to prove that the alleged error was not waived. Waiver in this context, that is, in the context of due process violations that implicate fundamental rights,[16] ordinarily must be intelligently and knowingly made. CP § 7–106(b). Alternatively, the petitioner must prove that special circumstances exist as to why he failed to allege the error in a prior proceeding. *Id.*

### a. Pleading Non–Waiver

■■■ In his motion to reopen, Harris asserted that postconviction counsel did not adequately plead non-waiver as to three errors: 1) the trial court's improperly allowing the jury to deliberate on the first-degree murder count, in violation of Harris's right to be free from double jeopardy; 2) the trial

---

16. The "knowing and intelligent" standard for waiver does not apply, for example, to "[t]actical decisions, when made by an authorized competent attorney, as well as legitimate procedural requirements"; the definition of waiver in these instances is governed by caselaw, pertinent statutes, or rules. *Curtis v. State,* 284 Md. 132, 150–51, 395 A.2d 464 (1978). *See also State v. Rose,* 345 Md. 238, 244–45, 691 A.2d 1314 (1997); *Hunt v. State,* 345 Md. 122, 138, 691 A.2d 1255 (1997).

court's giving a faulty reasonable doubt instruction; and 3) the trial court's failing to intervene when the prosecutor made improper statements in closing argument.

The postconviction petition shows that postconviction counsel properly pleaded non-waiver as to the three issues Harris mentions. As to all three issues, the petition alleged that Harris "did not intelligently or knowingly fail to allege these grounds previously because he was never advised of his right to do so, either by his trial attorney or by the trial court." It further averred that the postconviction court should not bar Harris's postconviction claim for "procedural" reasons because to do so would be "inconsistent with the waiver standard in [the UPPA]." As to the double jeopardy claim, postconviction counsel alleged that "this issue has not been waived because it involves a fundamental right ( [d]ouble [j]eopardy) and [Harris] never 'intelligently and knowingly' waived this right." Finally, specific to the reasonable doubt instruction, the petition alleged that Harris "has not waived this claim because a proper reasonable doubt instruction implicates [Harris's] fundamental right to a fair trial where he is presumed innocent .... [which he] has not 'intelligently and knowingly' waived."

In addition, in denying Harris postconviction relief, the postconviction court never mentioned at any point that the issue of non-waiver as to fundamental rights had not been properly pleaded. Moreover, the postconviction court did not decide non-waiver on the basis of failure to plead, as Harris now argues; rather, it addressed the non-waiver issue on its merits, finding that Harris's evidence had not rebutted the presumption of waiver. Accordingly, there is no merit to Harris's argument that postconviction counsel was ineffective because he did not plead non-waiver of fundamental rights.

### b. Proving Non–Waiver

To the extent that Harris is asserting that postconviction counsel failed to *prove* non-waiver, this argument also lacks merit. As noted above, the postconviction court *did reach* the merits of this issue; it concluded that it was "not persuaded" by the evidence that the presumption of non-waiver had been

rebutted. Furthermore, to this Court, Harris does not explain what further proof postconviction counsel could have offered with respect to the non-waiver issue.

Harris does not make any argument at all about two of the due process issues: the reasonable doubt instruction and the prosecutor's statements in closing argument. He mentions these issues only in a footnote, without any explanation of their substance (for example, what constituted the reasonable doubt instruction and what was deficient about it, and what was said by the prosecutor in closing), or any argument about how they implicated his fundamental rights. Without an explanation of the substance of these issues and what additional proof postconviction counsel should have brought forth, we cannot agree with Harris that postconviction counsel rendered ineffective assistance on this ground.

Finally, for the reasons we already have explained, there was no double jeopardy violation in this case. The trial court did not allow Harris to be convicted of a crime he had been acquitted of. Even if the postconviction court had ruled in 1997 that Harris had not waived this fundamental right, that ruling would have had no impact on the outcome of the case. Accordingly, there was no reason to reopen the postconviction proceeding on that ground.

### 2. Pleading Prejudice

Harris asserts that his postconviction counsel was ineffective because he failed to properly plead prejudice, the second requirement of an ineffective assistance of counsel claim under *Strickland.*[17] He cites the postconviction court's September 5, 1997 memorandum and order denying his petition for postconviction relief as support for this assertion.

The postconviction court's memorandum and order does not support Harris's assertions. The postconviction court did not

---

17. As noted above, in his brief, Harris at times argues that postconviction counsel did not properly *plead* prejudice under *Strickland,* and at times argues that he did not properly *prove* prejudice, without recognizing any distinction between the two.

deny Harris relief on the ground that postconviction counsel did not properly plead prejudice under *Strickland*. On the contrary, the postconviction court ruled that it was not persuaded by the evidence that Harris had proved the ***performance*** prong of *Strickland* (*i.e.,* that the errors postconviction counsel was alleging on the part of trial counsel and appellate counsel constituted deficient performance). Moreover, contrary to Harris's argument, postconviction counsel ***did*** properly plead the prejudice prong of the *Strickland* test.

### D. Cumulative Errors

Finally, Harris argues that the postconviction court erred in not reopening the closed postconviction proceeding because all of postconviction counsel's errors, considered cumulatively, constituted ineffective assistance of counsel. Because, as discussed *supra,* we find no merit to any of Harris's ineffective assistance of counsel claims, we likewise find this argument to be without merit.

**ORDER AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**