*Brian Tate v. State of Maryland*, No. 65, September Term, 2017. Opinion by Greene, J.

**CRIMINAL LAW—CRIMINAL PROCEDURE—MARYLAND RULE 4-242(c)—VALIDITY OF A GUILTY PLEA**

Pursuant to Maryland Rule 4-242(c), a court may not accept a guilty plea unless it is made knowingly and voluntarily. Whether a guilty plea is made knowingly and voluntarily is reviewed under the totality of the circumstances. *State v. Priet*, 289 Md. 267, 276, 424 A.2d 349, 354 (1981). Without needing to look outside the record of the plea hearing, the Court of Appeals held that Mr. Tate knowingly and voluntarily pleaded guilty to first-degree murder. Mr. Tate affirmed, on the record, that he had received a copy of the charges, that he read the charges, that he discussed the charges with his attorney, that he understood the charges, that he understood what he was pleading guilty to, that he told his attorneys all the facts about the case, that they told him what he could do in court, and that they had done everything they could in his defense. Mr. Tate confirmed that he and his attorneys discussed at length the plea negotiations, and that Mr. Tate chose to proceed with entering his guilty plea. Additionally, the facts of the crime would lead to no other reasonable conclusion other than that he committed first-degree murder.

**CRIMINAL LAW—CRIMINAL PROCEDURE—APPEAL OF A CONVICTION FOLLOWING A GUILTY PLEA**

The Court of Appeals in *State v. Daughtry*, 419 Md. 35, 72–73, 18 A.3d 60, 82 (2011), held that a reviewing court must limit itself to the record before the plea hearing judge when assessing whether a guilty plea was made knowingly and voluntarily. The postconviction hearing judge who reviewed Mr. Tate's guilty plea applied *Daughtry* to the facts of the case before him despite the difference in procedural posture between *Daughtry* and Mr. Tate's case. The *Daughtry* opinion only applies to appeals of convictions after a guilty plea, whereas review in Mr. Tate's case was based upon his request to reopen his postconviction case pursuant to Section 7-104 of the Criminal Procedure Article of the Maryland Code (2001, 2008 Repl. Vol.). The postconviction hearing judge erred as a matter of law in applying the *Daughtry* opinion beyond its context to the collateral review process in Mr. Tate's case.

**CRIMINAL LAW—CRIMINAL PROCEDURE—CRIM. PROC. § 7-104—INTERESTS OF JUSTICE**

Section 7-104 of the Criminal Procedure Article of the Maryland Code (2001, 2008 Repl. Vol.) permits a court to reopen a postconviction proceeding when doing so would be in the interests of justice. Believing that the *Daughtry* opinion had changed the law, the hearing judge held that it was in the interests of justice to reopen Mr. Tate's postconviction proceedings. Because the *Daughtry* opinion did not alter the law applicable to Mr. Tate's case or this Court's guilty plea jurisprudence, the postconviction hearing judge abused his discretion in reopening Mr. Tate's case.

IN THE COURT OF APPEALS

OF MARYLAND

No. 65

September Term, 2017

_____

BRIAN TATE

v.

STATE OF MARYLAND

_____

Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,
Rodowsky, Lawrence F. (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Greene, J.

_____

Filed: June 25, 2018

# I.

The dispositive question before us in this case is whether, under the totality of the circumstances, Petitioner Brian Arthur Tate knowingly and voluntarily pleaded guilty to first-degree murder. After failing to seek leave to appeal his conviction following his guilty plea and failing to obtain requested postconviction relief, Mr. Tate requested that his postconviction matter be reopened pursuant to Section 7-104 of the Criminal Procedure Article of the Maryland Code (2001, 2008 Repl. Vol.) ("Crim. Proc. § 7-104"). Mr. Tate alleged that this Court's decision in *State v. Daughtry*, 419 Md. 35, 18 A.3d 60 (2011), required, in the interests of justice, that the postconviction hearing judge reconsider his decision to deny Mr. Tate relief. The postconviction hearing judge reopened the case and, thereafter, vacated Mr. Tate's guilty plea. On appeal, the Court of Special Appeals reversed that decision.

This Court granted *certiorari* and now affirms the judgment of the Court of Special Appeals. The record of the plea hearing alone demonstrates that Mr. Tate entered his guilty plea knowingly and voluntarily. Additionally, the postconviction hearing judge reopened the proceedings and vacated the guilty plea based on this Court's opinion in *Daughtry*. Procedural distinctions preclude *Daughtry's* application to the present case. Believing that *Daughtry* had changed the law and, thus, it was in the interests of justice to reopen Mr. Tate's postconviction proceedings and set aside his guilty plea, the postconviction hearing judge erred and abused his discretion.

## II.

Brian Arthur Tate pleaded guilty to first-degree murder based on the following statement of facts. On February 24, 1992, Mr. Tate engaged in an altercation with the victim on or near Summit Drive in Annapolis, Maryland. Eventually, Mr. Tate dragged the victim's body behind a nearby shed. Then Mr. Tate left the scene. An autopsy conducted by the State's medical examiner revealed that the victim had endured 24 stab wounds and slashes to multiple parts of his body, including the back, lungs, liver, neck, arms, and hands. Additionally, the victim suffered blunt force trauma to the head which caused various bone fractures. The police recovered a broken knife, the suspected murder weapon, at the scene of the crime.

As a result of investigation, Anne Arundel County Police learned from various witnesses that Mr. Tate had threatened the victim several times prior to the altercation because the victim had begun to date Mr. Tate's former girlfriend. One such threat included that Mr. Tate planned to dress in dark clothing to catch the victim by surprise, stab him, cut his throat, and after the victim died, Mr. Tate would continue to physically assault the victim. Another such threat indicated that Mr. Tate had been sharpening his knife in preparation for the assault. Witnesses also admitted to seeing a knife and sharpening stone in Mr. Tate's bedroom prior to the homicide as well as seeing Mr. Tate with brass knuckles on the day of the homicide. After the police conducted a search of Mr. Tate's home, they recovered a blood-stained black ski jacket. A DNA test established that the victim's DNA was on the jacket. Lastly, as a result of the search, police uncovered brass knuckles and the victim's wallet in Mr. Tate's home.

2

*Plea Hearing and Sentencing*

On March 16, 1992, a grand jury in the Circuit Court for Anne Arundel County indicted Brian Arthur Tate in case number K-92-862 for: first-degree murder, armed robbery, attempted armed robbery, robbery, assault with intent to commit robbery, and theft. In an unrelated case, case number K-92-863, Mr. Tate was charged with several counts of attempted murder, arson, burning the personal property of another, and reckless endangerment. Mr. Tate pleaded guilty to first-degree murder on November 2, 1992 in exchange for the State entering a nolle prosequi ("nol pros") to the remaining charges contained in indictment number K-92-862, as well as charges in indictment number K-92-863. The State agreed to withdraw its request for a sentence of life without the possibility of parole. The State also agreed not to oppose Mr. Tate's request for admission to the Patuxent Institution. The State and the defendant expressed, in general terms, that they agreed to the conditions, including Mr. Tate pleading guilty to first-degree murder that occurred in the way expressed in a detailed statement of facts. Thereafter, the Honorable Raymond G. Thieme, the plea hearing judge, directly addressed the voluntariness of Mr. Tate's decision to plead guilty:

> THE COURT: Ha[ve your attorneys] gone over [t]his letter of October 30, 1992[,] with you?
> MR. TATE: Yes, [they have].
> THE COURT: Ha[ve they] read to you, or have you read the statement of facts that are attached thereto?[1]

---

[1] Prior to his plea hearing, Mr. Tate read and agreed to the following statement of facts attached to the correspondence between his attorney and the State:

> On Monday, February 24, 1992, between 10:30 p.m. and 11:00 p.m. Ms.
> (continued . . .)

3

Zedra Bognar, who was residing with her fiancé's parents at 989 Roundtop Drive, Annapolis, Anne Arundel County, Maryland, heard what she described as "fighting sounds" outside the residence. She looked from her bedroom window and saw the victim, identified as Jerry Lee Haines, who lived across the street at 1174 Summit Drive. Jerry was approached by a person she referred to as a stranger, approximately 6-feet tall, 200-pounds and wearing a dark jacket, light blue jeans and baseball cap.

Ms. Bognar observed Jerry and the stranger struggle near Jerry's white pick-up trick which Jerry had parked next to his house near the corner of Summit and Roundtop Drives.

Ms. Bognar observed the fight move from the truck to the area next to 989 Roundtop. She observed "the stranger" standing next to Jerry, beating and kicking him in the area of the face. She heard Jerry calling for his Mom for help and begging his assailant to stop.

Ms. Bognar asked her fiancé's mother, Mrs. Barbara Hartley, to call the police, which she did. While Mrs. Hartley was on the telephone to police, Zedra continued to report to Mrs. Hartley the actions of the stranger and Jerry Haines. Ms. Bognar observed the stranger drag the body of Jerry past her bedroom window and to the rear of 1176 Summit Drive, the home of Marshall and Gloria Vestal, and hide the body behind a shed. She then observed the stranger walk back to the street, look around, and walk away.

When police arrived the body of the victim, Jerry Lee Haines, was discovered behind the shed and "the stranger" was gone.

A subsequent autopsy of the victim by the Office of Chief Medical Examiner for the State of Maryland revealed the victim had suffered twenty-four (24) stab and cutting wounds to his body, including fourteen (14) wounds to the back, both lungs, liver, bilateral homothoraces; six (6) wounds to the neck; two (2) to the upper right and one to the upper left arm; one (1) to the left hand; and multiple cutting wounds to the neck, hands and right forearm. In addition[,] he suffered blunt force trauma to the head, including multiple facial lacerations and fractures of the nasal and right maxillary bones. Dr. John [Smialek], Chief Medical Examiner for the State of Maryland would testify [that] the manner of death was homicide. []

A search of the crime scene revealed the handle and partial blade of a broken knife which is believed to [have been] used to inflict the stab and cutting wounds sustained by the victim.

Through investigation[,] Anne Arundel County Police learned the Defendant, Brian Arthur Tate, had made several threats against the life of the victim, Jerry Lee Haines, because Jerry had been dating Tate's former girlfriend, Tammi Heath.

Among the witnesses the State would call to prove these threats would be Brian Hannon[,] who would testify [that] the Defendant told him he was going to

MR. TATE: Yes, I have.

THE COURT: Ha[ve they] told you the consequences of coming in here pleading guilty?

MR. TATE: Yes, [they have], Your Honor.

THE COURT: Told you what rights you are giving up?

MR. TATE: Yes, [they have].

THE COURT: Do you understand the maximum penalty could be up to life?

MR. TATE: Yes, I do.

THE COURT: Now, other than what has been set forth in this letter, have there been any other inducements or promises of any type to get you to come in here and plead guilty?

MR. TATE: Not that I am aware of, Your Honor.

THE COURT: Has anyone threatened you?

MR. TATE: No one.

THE COURT: Are you under the influence of any alcohol, drugs, narcotics, or other pills?

MR. TATE: No, I'm not.

---

(. . . continued)

dress up in dark clothing and ambush Jerry at his residence. He told Brian he would stab Jerry and cut his throat[,] and that after he was dead he would physically assault and batter him. Tate told Hannon that he had been sharpening a knife all week long.

Among the other witnesses the State would call to substantiate these threats are Sandra Eastwood and Joseph Allen, who would both testify [that] they were told by the Defendant that he intended to kill Jerry.

A witness for the State, Amanda Jones, would testify that she was in the bedroom of the Defendant, prior to the homicide[,] and observed a sharp knife, approximately 10-inches long, and a sharpening stone under his bed.

Another State's witness, Mark Wirth, would testify that he saw the Defendant with a pair of brass knuckles on February 24, 1992, prior to the homicide.

A search and seizure warrant, executed February 25, 1992, at the home of the Defendant produced a blood stained black ski jacket, owned by the Defendant, which revealed the presence of human blood on the right cuff. This blood was compared by Cellmark Laboratories with the blood of the victim, Jerry Lee Haines, by DNA profiling[,] and found to be a positive match. In addition, a subsequent search of the victim's bathroom, adjacent to his private bedroom revealed a pair of brass knuckles and the victim's wallet, which contained his personal papers and identification.

5

Notably, Judge Thieme inquired into Mr. Tate's educational level, his mental health status, and his prior criminal record:

> THE COURT: How far did you go in school?
> MR. TATE: Halfway through my junior year, Your Honor.
> THE COURT: Now, other than this case, where I know you have been examined by various mental health individuals, before this case have you ever been under the care of a psychiatrist or in a mental institution?
> MR. TATE: Yes, I have.
> THE COURT: How long ago?
> [MR. TATE'S ATTORNEY]: Your Honor, if it pleases the Court, some months before the incident in question, Brian, after a series of difficulties at home and school, was presented by his parents in the offices of a Dr. Steven Lasht, who I believe is a licensed social worker, perhaps [a] psychologist, for some counseling sessions.
> I have seen some statements, very brief statements, coming out of those interviews, and it does not appear that there was anything suggested in that counseling that would indicate that Mr. Tate, Brian Tate, did not understand the nature of the proceedings before the Court today.
> THE COURT: Mr. Tate, is that correct?
> MR. TATE: Yes, it is, Your Honor.
> THE COURT: Are you now on parole or probation for anything?
> MR. TATE: No, I am not.

Then Judge Thieme assessed Mr. Tate's understanding of his decision to plead guilty to first-degree murder:

> THE COURT: Were you given a copy of the charges?
> MR. TATE: Yes, I have.
> THE COURT: Have you read it and discussed it with your attorney[s]?
> MR. TATE: Yes, I have.
> THE COURT: Do you understand what you are charged with?
> MR. TATE: Yes, I do.
> THE COURT: Do you understand what you are pleading guilty to?
> MR. TATE: Yes, I do.
> THE COURT: Now, I am telling you, these charges aren't evidence. They are only accusations. You have a right to plead not guilty. If you plead not guilty[,] [] you could be found [not] guilty, the charges have to be proved by evidence, which convinces a jury, or a [c]ourt, if you want, that you are

6

guilty to the exclusion of a reasonable doubt, and to a moral certainty.  Do you understand that?

        MR. TATE: Yes, I do.

A part of Judge Thieme's assessment included questions regarding Mr. Tate's belief in the competence of his defense attorneys as well as their advice:

> THE COURT: Did you tell your attorneys all the facts about this case?
> MR. TATE: Excuse me, Your Honor.
> THE COURT: Did you tell your attorneys all the facts about this case as best you know them[?]
> MR. TATE: Yes[,] I have.
> THE COURT: Did they tell you what you can do in court?
> MR. TATE: Yes.
> THE COURT: Is there anything you wanted them to do that they haven't done?
> MR. TATE: No, there isn't.  They've done everything they can.
> THE COURT: Are you satisfied with the services of your attorneys?
> MR. TATE: Yes, I am.
> THE COURT: Do you believe they are competent?
> MR. TATE: Yes, I do.

Notwithstanding Mr. Tate affirming that his attorneys explained to him the consequences of a guilty plea, Judge Thieme also explained the ramifications to Mr. Tate on the record:

> THE COURT: I am telling you, even though in fact you may be guilty of this offense to which you are pleading guilty, you have a right to plead not guilty.  You are entitled to a speedy public trial by either a jury or Court, whichever you want, and you have a right to have your attorney with you throughout your trial.  Do you understand you are giving up those right[s]?
> MR. TATE: Yes, I do.
> THE COURT: Do you understand you are giving up your right to a trial by jury?
> MR. TATE: Yes, I do.
> THE COURT: Now, I am telling you, a jury consists of 12 people selected at random from this county, each of them at least 18 years of age.  To find you guilty[,] all 12 have to say you are guilty upon evidence that satisfies them of your guilt to the exclusion of a reasonable doubt, to a moral certainty.  Do you understand that?
> MR. TATE: Yes, I do.
> THE COURT: Do you understand you are giving up that right?

MR. TATE: Yes, I do.

THE COURT: Have you discussed that right with your counsel[ors]?

MR. TATE: Yes, I have.

THE COURT: I am telling you, when you plead guilty, you are giving up your right to see, hear and question the State's witnesses. You are giving up your right to call witnesses or present any evidence [o]n your behalf. Do you understand that?

MR. TATE: Yes, I do.

THE COURT: And you are giving up your right to remain silent.

MR. TATE: Yes, I do.

THE COURT: I am telling you, you are presumed innocent, and this presumption continues throughout your trial until overcome by proper evidence proving you are guilty to the exclusion of a reasonable doubt. Do you understand you are giving up the benefits of what I just said?

MR. TATE: Yes, I do.

THE COURT: Are you pleading guilty of your own free will?

MR. TATE: Yes, I am.

THE COURT: Are you pleading guilty because you are guilty?

MR. TATE: ---[2]

THE COURT: I am telling you, when you plead guilty you are giving up your right to complain about any defects, mistakes, errors or irregularities in the State's case, and these in part go to the motions that your attorneys have filed on your behalf. And amongst other things, these motions go to the question of any invalid search and seizure, and invalid warrant, and any invalid arrest. Do you understand that?

MR. TATE: Yes, I do.

THE COURT: Do you understand you are giving up your right to proceed further with those motions?

MR. TATE: Yes.

Finally, Judge Thieme discussed ancillary ramifications of Mr. Tate's plea:

THE COURT: Have you made any statements to the police or any public official? If[] for any reason you feel that they weren't freely or voluntarily made, you are entitled to a separate hearing, either before your trial or during your trial to have me decide[] whether they were freely and voluntarily made, they can't be used against you. Do you understand you are giving up your [right] to proceed further with this?

MR. TATE: Yes, I do.

---

[2] At this point, and at several other times, the hearing transcript reflects that Mr. Tate's response was inaudible. The absence of a response is denoted by the following symbol: ---.

THE COURT: If I accept your guilty plea, you lose your automatic right to appeal. If I sentence you, you have 30 days to ask the [h]igher [c]ourt to let you appeal. If they let you appeal, the only points you could raise would be the jurisdiction of this [c]ourt and the validity of the sentence, the voluntariness of this plea, and the competence of your attorney.

All that means is if the State proves the crime occurred in Anne Arundel County, and you challenge my right to try you on appeal, you would lose. Do you understand?

MR. TATE: Yes, I do.

THE COURT: Do you understand that if the record shows that you are [] intelligently, voluntarily, and knowingly pleading guilty, and you challenged your guilty plea on appeal, you would lose. Do you understand?

MR. TATE: Yes.

THE COURT: If I give you any sentence within the limits prescribed by law, and you challenge that on appeal, you would lose.

And lastly, if you claimed that your attorneys didn't represent you properly, unless you could prove that on appeal, you would lose.

MR. TATE: I understand, Your Honor.

THE COURT: Is there anything about what I have questioned you [that] you don't understand?

MR. TATE: None, Your Honor.

THE COURT: Do you want to ask me any questions?

MR. TATE: No, Your Honor.

THE COURT: You still want to go ahead with this.

MR. TATE: Yes, I do.

THE COURT: The Court is satisfied.

After Judge Thieme expressed his satisfaction with the defendant's response to the questions posed, one of Mr. Tate's attorneys followed with additional questions regarding the context of Mr. Tate's knowledge and voluntariness with regard to the guilty plea:

[MR. TATE'S ATTORNEY]: Mr. Tate, you are under 18, is that correct?

MR. TATE: Yes, sir.

[MR. TATE'S ATTORNEY]: And when we began to discuss the possibility of this plea, and once it reached the form that you have heard given to the Court, [co-counsel] and I have met with you in [the] Anne Arundel County Detention Center in the company of both of your parents, is that correct?

MR. TATE: Yes, sir, it is.

9

[MR. TATE'S ATTORNEY]: And that was in person, and not through windows, and we discussed for over an hour this plea negotiation, is that correct?

MR. TATE: Yes.

[MR. TATE'S ATTORNEY]: And [co-counsel] and I refrained from making any recommendation at that time, did we not?

MR. TATE: Yes, sir.

[MR. TATE'S ATTORNEY]: And did you have an opportunity to discuss this fully with your parents as well?

MR. TATE: Yes, I have.

[MR. TATE'S ATTORNEY]: Now, also to ensure that this is your decision and not your parents' decision, I followed up and saw you very early the next morning, is that correct?

MR. TATE: Yes, it is.

[MR. TATE'S ATTORNEY]: And you indicated to me at that time that that was also your decision as well, is that correct?

MR. TATE: Yes, I have.

[MR. TATE'S ATTORNEY]: And you discussed this further with other relatives and an attorney in New York as well, is that correct?

MR. TATE: Yes.

[MR. TATE'S ATTORNEY]: Okay. Now, one thing I want to make absolutely clear and the Judge did tell you about this, but you remember that hearing we had in here for a number of days where we very heatedly argued against the finding of the wallet in your bedroom?

MR. TATE: Yes.

[MR. TATE'S ATTORNEY]: Do you understand you are giving up your right to appeal [the judge's] decision that that should be admitted into evidence in the proceeding in this matter. In other words, once everything is said and done here, and at your sentencing, you can't come back afterwards and say, "Hey, I want to appeal the issue of whether that wallet should have been entered into evidence." Do you understand that?

MR. TATE: ---

[Mr. Tate's Counsel]: Do you have anything you would like to ask of myself or [co-counsel] at this time?

MR. TATE: ---

THE COURT: You still want to go ahead?

MR. TATE: Yes, I do, Your Honor.

At the conclusion of defense counsel's questioning, Judge Thieme again expressed his satisfaction with the response. The statement of facts was read into the record, and the State proffered to Judge Thieme that it had multiple witnesses to testify to the veracity of

10

the statement. After hearing no objection from Mr. Tate's attorneys, Judge Thieme found Mr. Tate guilty of first-degree murder, and the case was set in for sentencing.

Mr. Tate was sentenced on January 18, 1993. The State called two witnesses who were members of the victim's family. Mr. Tate called two licensed psychiatrists to support his request to receive psychological treatment at the Patuxent Institution. Ultimately, Judge Thieme sentenced Mr. Tate to life in prison with the possibility of parole and recommended Mr. Tate for treatment at Patuxent.

*Request for Postconviction Relief*

Mr. Tate filed a Petition for Postconviction Relief in September 2005, at which time the Circuit Court for Anne Arundel County took no action. Mr. Tate filed an Amended Petition for Postconviction Relief in January 2006. In his Amended Petition, Mr. Tate, in part, argued that he did not fully understand his guilty plea, including the nature of the charges and possible defenses as well as that there was no discussion on the record regarding his intent, the differences between premeditated and felony murder, and that there was no factual finding that he knowingly and voluntarily entered the plea, all of which rendered his guilty plea a nullity. For reasons not entirely clear from the record, the case was transferred to the Circuit Court for Howard County in July 2006. In February 2007, the Circuit Court for Howard County stayed proceedings with regard to the Amended Petition for Postconviction Relief to permit Mr. Tate to file a belated application for leave to appeal his conviction, which the Court of Special Appeals denied in May 2009.

The Circuit Court for Howard County resumed proceedings in the postconviction case and held a hearing in September of 2009. Mr. Tate raised two different allegations of

11

error in his request for postconviction relief: that his guilty plea was invalid, and that his trial counsel was ineffective.[3] The postconviction hearing judge weighed the "very thorough colloquy" as well as evidence that was not before the plea hearing judge[4] and concluded that Mr. Tate's guilty plea was valid and that he did not receive ineffective assistance of counsel with regard to the guilty plea. The postconviction hearing judge found that "there was [an] abundan[ce of] objective evidence of premeditation presented" and that the facts read into the record "crystallized the basic elements or components of premeditated [f]irst-[d]egree [m]urder." Additionally, the postconviction hearing judge found, based upon testimony from one of Mr. Tate's attorneys,[5] that the attorneys discussed the plea bargain comprehensively and, as a part of that conversation, the attorneys would have discussed with Mr. Tate the facts as well as "the nature of the plea."

The postconviction hearing judge determined that Mr. Tate failed to prove he was entitled to postconviction relief on each of his additional claims as well, apart from his

---

[3] Included within the broader claim of ineffective assistance of counsel were multiple specific allegations of error, including that his attorneys provided ineffective assistance when failing to fully investigate his case, when advising him to plead guilty to first-degree murder, for pressuring Mr. Tate to plead guilty, for permitting Mr. Tate's family to pressure him to plead guilty, for failing to raise the defense of Not Criminally Responsible, for failing to advise of collateral consequences to his plea, for failing to be effective at sentencing, for failing to file an application for three-judge panel review of Mr. Tate's sentence, and that the cumulative errors resulted in denying Mr. Tate a fair trial.

[4] Evidence considered by the postconviction hearing judge that was not before Judge Thieme at the plea hearing included conversations prior to the plea hearing, testimony from the sentencing hearing, psychological reports from Mr. Tate's time at Patuxent, and testimony at the postconviction hearing.

[5] The attorney who testified sat as second chair on Mr. Tate's case.

claim of ineffective assistance of counsel based on his request for a three-judge panel. Because Mr. Tate testified both that he requested his counsel to file for review by a three-judge panel and that his attorneys ignored his request, with no testimony to the contrary,[6] the hearing judge granted Mr. Tate the right to file a belated application for review by a three-judge panel.

Mr. Tate filed his Application for Review of Sentence in June 2010 and the Circuit Court for Howard County granted his request for review by a three-judge panel. At that time, Mr. Tate also filed an Application for Leave to Appeal the postconviction hearing judge's denial of the requested relief. The three-judge panel reviewed Mr. Tate's sentence in November 2010 and determined that Mr. Tate's sentence should remain unchanged, which Mr. Tate appealed and which the Circuit Court consolidated with his then pending application for leave to appeal.

*Request to Reopen Postconviction Proceedings*

In September 2011, Mr. Tate filed a motion entitled, "Motion to Reopen Postconviction Case" in which he argued that the recently decided case, *State v. Daughtry*, 419 Md. 35, 18 A.3d 60 (2011), required reopening his case in the interests of justice. In December 2012, new counsel for Mr. Tate filed supplemental briefing to support his argument to reopen postconviction proceedings. The Circuit Court for Howard County held the motion *sub curia* pending a decision by the Court of Special Appeals on Mr. Tate's application for leave to appeal. In June 2013, the Court of Special Appeals denied both

---

[6] The lead attorney in Mr. Tate's case died prior to Mr. Tate's postconviction hearing. As a result, he could not testify to confirm or deny Mr. Tate's assertions.

applications for leave to appeal. The Circuit Court for Howard County thereafter set a hearing on the postconviction matters, and the hearing judge reopened proceedings in September 2014. Specifically, the hearing judge reopened proceedings to consider: "Did [Mr. Tate] knowingly, intelligently, and voluntarily enter his guilty plea when there was no on-the-record confirmation that he understood the elements of the crime to which he pled?"

The postconviction hearing judge granted the requested relief by vacating the judgment entered pursuant to the plea agreement. He reasoned that "*Daughtry's* on-the-plea record hearing requirements, when read closely and applied, using the 'totality of the circumstances [analysis],' to the unique facts of this case, require the plea and the bargain supporting it to be set aside." The basis of his decision was that *Daughtry* required Mr. Tate to receive an explanation at the plea hearing of the complexity of first-degree murder. Specifically, the hearing judge noted in his written discussion of his basis for ruling to vacate the guilty plea that

> neither the plea judge [n]or trial counsel ever explained the nature or the elements of the offense of *premeditated* first-degree murder and its complexities in express terms at the plea hearing. No expressed differentiation of the specific intent to commit that crime of aggravated murder, either in technical legal or layman's terms was placed on the record *at the plea hearing*. No expressed differentiation of *premeditated* first-degree murder versus first-degree felony murder, which he could have been found guilty of, given the simple form of the first-degree murder count under which he was charged and the robbery count in the indictment, was placed on the record. Nor was there an expressed differentiation of the other degrees of murder, *i.e.*, second degree, *explained or set out on the record at the plea hearing*, nor were the words "feloniously, willful, deliberate, premeditated, malice of forethought[,]"[] the formal legal description of first-degree murder as charged in his indictment pursuant to former Article 27, § 407 of

14

the Annotated Code of Maryland, the statute under which he was charged, ever uttered at the plea hearing.

The postconviction hearing judge expressed his concern that Judge Thieme "never made a finding that Mr. Tate knowingly, freely and voluntarily entered the plea." The hearing judge distilled from *Daughtry* that "the record of *the plea hearing* must contain some evidence that proves the defendant possessed the necessary knowledge of the crime's elements[,]" and that it was "no longer sufficient to presume that a defendant understands such things merely because he is represented by counsel." The hearing judge found that "[i]n the present case, this [c]ourt now finds the *plea record* lacks any expressed exposition of the nature or elements of the crime, *premeditated* first[-]degree murder, to which [Mr. Tate] pled guilty as required by *Daughtry*, other recent guilty plea appellate rulings cited herein, and Rule 4-242." Therefore, the hearing judge set aside Mr. Tate's guilty plea and remanded the case to the Circuit Court for Anne Arundel County for a new trial.

The State filed an application for leave to appeal the postconviction relief granted and requested a stay of further proceedings in October 2014. The Circuit Court for Anne Arundel County granted the State's motion to stay pending the outcome of the application for leave to appeal.

The Court of Special Appeals heard the State's appeal. In an unpublished opinion, the intermediate appellate court first denied Mr. Tate's motion to dismiss and held that the State properly filed for leave to appeal. *See State v. Tate*, No. 2823, Sept. Term, 2014 (Md. Ct. Spec. App., August 15, 2017). Next, the court reversed the judgment of the Circuit Court that granted postconviction relief to Mr. Tate. *Id.* (presenting the Court of Special

15

Appeals with the issue of whether the Circuit Court for Howard County erred in setting aside Mr. Tate's guilty plea). The Court of Special Appeals held that under the totality of the circumstances, Mr. Tate knowingly and voluntarily entered his guilty plea. *Id.*

Mr. Tate petitioned this Court for *certiorari*, which we granted. *Tate v. State*, 456 Md. 524, 175 A.3d 151 (2017). Mr. Tate presented the Court with the following question:

> Was Brian Tate's guilty plea record sufficient to conclude he understood the nature and elements of first-degree murder, despite the fact that he was a minor with diminished mental capacity and no one addressed the nature and elements of the crime on the record?

We answer in the affirmative that the guilty plea record was sufficient for Judge Thieme to conclude that Mr. Tate understood the nature and elements of first-degree murder. Upon our review of the jurisprudence of this Court with regard to the validity of guilty pleas and the totality of the circumstances, we conclude that nothing about the *Daughtry* case changed the determination initially made by Judge Thieme and then later affirmed at the postconviction hearing. The hearing judge misinterpreted our opinion in *Daughtry* and abused his discretion when he used the case as the basis for reopening Mr. Tate's postconviction proceedings.

### III.

Our primary task is to determine whether Mr. Tate's guilty plea was valid. This case also raises further questions of whether the *Daughtry* opinion applies to the facts of Mr. Tate's postconviction case as well as whether Mr. Tate's postconviction case should have been reopened at all. Mr. Tate contends that, at his plea hearing, neither Judge Thieme nor Mr. Tate's counsel explained sufficiently on the record the nature or elements of

16

premeditated first-degree murder. According to Mr. Tate, that deficiency alone would merit, under *Daughtry*, vacating the guilty plea. Mr. Tate maintains that, when coupled with his age and his mental status, the totality of the circumstances would demonstrate that the inquiry on the record was insufficient. Mr. Tate urges this Court to reconsider our guilty plea jurisprudence with an understanding that the United States Supreme Court, as well as other courts, have created distinct criminal procedures for juveniles due to certain scientific evidence that has shown juveniles face disadvantages in criminal proceedings. Finally, Mr. Tate argues that the Court of Special Appeals should not have disturbed the findings made by the postconviction hearing judge without concluding that the findings were clearly erroneous.

To the contrary, the State argues that *Daughtry* did not alter the legal landscape for what constitutes a defective guilty plea. In terms of where Mr. Tate's plea fits on the spectrum of guilty plea cases, the State contends that this case is more similar to *Priet* than *Daughtry*. Additionally, the State does not contest that Mr. Tate's youth and mental status are factors that a hearing judge should consider, but rather the State does contest Mr. Tate's characterization that those factors were not considered in this case based on the record.

We first turn to whether the postconviction hearing judge's conclusion to set aside Mr. Tate's guilty plea was correct. When an appellate court reviews the application of the law to the facts of a case, a trial court receives no deference. *Daughtry*, 419 Md. at 46, 18 A.3d at 66. In addition, a Circuit Court's application of the Maryland Rules is reviewed *de novo*. *Id.* at 46–47, 18 A.3d at 66–67.

17

The provision that sets forth the requirements for the court's acceptance of guilty pleas is found in Maryland Rule 4-242(c). Md. Rule 4-242(c) states:

> The court may not accept a plea of guilty, including a conditional plea of guilty, until after an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, the court determines and announces on the record that (1) the defendant is pleading voluntarily, with understanding of the nature of the charge and the consequences of the plea; and (2) there is a factual basis for the plea. In addition, before accepting the plea, the court shall comply with section (f) of this Rule. The court may accept the plea of guilty even though the defendant does not admit guilt. Upon refusal to accept a plea of guilty, the court shall enter a plea of not guilty.

A court assesses the knowing and voluntary nature of a guilty plea under the totality of the circumstances, as reflected by the record. *State v. Priet*, 289 Md. 267, 276, 424 A.2d 349, 354 (1981). The nature of the charge must be conveyed to the accused, and the court may presume, unless rebutted, that defense counsel routinely does so during the course of representation. *Id.* at 280, 281–82, 434 A.2d at 356 (quoting *Henderson v. Morgan*, 426 U.S. 637, 646–47, 96 S. Ct. 2253, 2258–60, 49 L. Ed. 2d 108, 114–15 (1976)). On appeal, a reviewing court must consider the record before the court at the time of the entry of the plea. *Daughtry*, 419 Md. at 79–80, 18 A.3d at 86 (quoting *State v. Priet*, 289 Md. 267, 291, 424 A.2d 349, 361 (1981)). However, on collateral review, for example in a *coram nobis* proceeding, a court may consider evidence outside the record of the guilty plea hearing, such as testimony from hearings subsequent to the plea hearing. *State v. Smith*, 443 Md. 572, 653–54, 117 A.3d 1093, 1141 (2015); *State v. Rich*, 454 Md. 448, 466–467, 164 A.3d 355, 366 (2017) (explaining that the decision to resolve a request for collateral review, like a *coram nobis* case, by reviewing evidence outside the record of the plea

18

hearing is discretionary, provided that the record itself is sufficient to make the determination).

Mr. Tate knowingly and voluntarily pleaded guilty to first-degree murder considering the totality of the circumstances. The postconviction hearing judge determined as much in 2010 when he denied relief to Mr. Tate. Nothing in the law changed between 2010 and 2014 to warrant further postconviction relief in Mr. Tate's case.

The record of the guilty plea hearing confirms that Mr. Tate knowingly and voluntarily pleaded guilty to first-degree murder. The State announced that Mr. Tate would plead guilty to first-degree murder as a necessary condition of the bargain, and the State would, in turn, nol pros the other charges. Mr. Tate discussed those terms, as well as the facts read into the record regarding the crime, with his counsel. Mr. Tate, when asked by Judge Thieme, said that he had read and discussed his charges with his attorneys. Mr. Tate confirmed for the court that he understood the charges to which he was pleading guilty. Mr. Tate also affirmed that he told his attorneys the facts of the case and that he believed that they had "done everything they c[ould]" under the circumstances.

Judge Thieme carefully reviewed the rights Mr. Tate waived as a result of his decision to plead guilty. Mr. Tate confirmed that he understood he was giving up his right to a jury or court trial, and that his right to trial had been discussed with his attorneys. He stated that he understood he was giving up his right to present evidence and call witnesses, the presumption of innocence, his right to raise Fourth Amendment defects with regard to his search and seizure, his right to possible Miranda violations based on the possible involuntariness of statements made to police, and his automatic right to appeal. In addition,

19

he affirmed his understanding that if "the record shows that [he was] intelligently, voluntarily, and knowingly pleading guilty, and [he] challenged [his] guilty plea on appeal, [he] would lose." Judge Thieme took care to ask if Mr. Tate had any questions or failed to understand any aspect of the proceeding, and Mr. Tate affirmed that he wanted to go forward with the guilty plea.

Judge Thieme had, on the record before him, sufficient facts to fairly conclude that Mr. Tate understood that he was charged with the premeditated and deliberate killing of the victim with malice. The facts on the record showed that Mr. Tate planned and rehearsed the murder. He stabbed and slashed the victim twenty-four times across the victim's body, broke parts of the victim's face, and hid the body. The police recovered the body where Mr. Tate hid it. Multiple witnesses corroborated the motive for the crime as well as the pre-meditation: that Mr. Tate planned to kill the victim, that he planned to ambush the victim at night in the dark, that he planned to use a knife, that he planned to continue to assault the victim after the victim died, and that Mr. Tate in fact had a knife, a sharpening tool, and brass knuckles prior to the murder. The victim's DNA was found on Mr. Tate's jacket, and brass knuckles as well as the victim's wallet were found in Mr. Tate's home. Without leaving room for interpretation, the detailed statement of facts captures the essence of first-degree murder.

Mr. Tate now contends that his youth at the time of the plea, the complexity of first-degree murder, and the lack of information on the record regarding the nature of the charges require this Court to determine that his guilty plea was defective. We agree that Mr. Tate's youth, the complexity of the charges, and the extent of the plea colloquy are relevant

20

considerations for a hearing judge. *See Priet*, 289 Md. at 288, 424 A.2d at 360. Indeed, Judge Thieme considered those factors at the plea hearing. He questioned Mr. Tate about his educational level, and Mr. Tate explained that he had attended school through half of his junior year in high school. Additionally, Judge Thieme asked if Mr. Tate had received prior psychiatric treatment, to which Mr. Tate's attorney responded that Mr. Tate had received counseling from a social worker or psychologist, but nothing that materialized from those sessions should have led Judge Thieme to find that Mr. Tate did not understand the nature of the proceedings. Judge Thieme asked Mr. Tate to confirm the accuracy of his attorney's representations to the court, which Mr. Tate did.

After Judge Thieme expressed his satisfaction with Mr. Tate's responses to the questions raised, Mr. Tate's attorney chose to ask additional questions related to Mr. Tate's age. Mr. Tate confirmed that he was under the age of eighteen. Mr. Tate's attorney delved into a meeting at the Anne Arundel County Detention Center where Mr. Tate and his counselors had discussed the plea negotiations for over an hour, which Mr. Tate agreed was accurate. Mr. Tate then agreed with his attorney's representation that he had the opportunity to discuss the plea bargain with his parents. Mr. Tate agreed with his counsel that the decision to proceed was his own decision. Mr. Tate also confirmed that he had spoken with other members of his family as well as another attorney about his plea bargain. After Mr. Tate's attorney finished questioning Mr. Tate, Judge Thieme again expressed his satisfaction with the responses. Based on the totality of the circumstances, Mr. Tate entered his guilty plea knowingly and voluntarily.

21

Mr. Tate next contends that when reviewing courts assess the knowing and voluntary nature of adolescent guilty pleas, they must consider the age of the defendant as well as "related characteristics" to determine if the defendant knowingly and voluntarily entered a guilty plea. Mr. Tate directs us to consider various cases from the United States Supreme Court, which treat juveniles differently than adults with regard to life sentences, as well as cases from Maryland which treat juveniles differently than adults with regard to Miranda violations. Mr. Tate fails to direct this Court, however, to any case in our jurisprudence, or elsewhere, which treats juvenile guilty pleas differently from adult guilty pleas. As this Court has previously held, a hearing judge should consider age and related characteristics such as educational level. *Priet*, 289 Md. at 288, 424 A.2d at 360.

Mr. Tate also contends that the complexity of first-degree murder required a greater showing than what was present on the record for the court to accept Mr. Tate's guilty plea as knowing and voluntary. Relying on *Daughtry*, Mr. Tate asks that we adopt a standard for crimes that are not easily understood that requires some degree of greater explanation, on the record, in order to show that a defendant understands the nature of the charges. *See Daughtry*, 419 Md. at 72–73, 18 A.3d at 82 (recognizing that not all crimes or elements of crimes are self-explanatory). According to the record before Judge Thieme, it was clear that Mr. Tate was admitting guilt to first-degree murder in exchange for a life sentence. Mr. Tate admitted to reading the charging document as well as the detailed letter containing the plea conditions. Mr. Tate admitted to discussing those charges not only with his counselors for his plea hearing, but also with another attorney. Mr. Tate stated that he understood the charge and to what he was pleading guilty. Mr. Tate explained that he told

22

his attorneys the facts of the case, that he read the statement of facts, and that he discussed the statement with his attorneys. Mr. Tate agreed that he had discussed with his attorneys various strategies for how to proceed in his case. He confirmed for the court that he understood the charges and was choosing, voluntarily, to proceed with pleading guilty.

Mr. Tate and the postconviction judge used the same example to support their conclusions that Mr. Tate may not have understood the nature of the charges to which he pleaded guilty. According to Mr. Tate and the postconviction hearing judge, Mr. Tate may have confused pleading guilty to premeditated first-degree murder with felony murder. This confusion seems unlikely, as the State announced at the outset that the agreement was conditioned upon Mr. Tate pleading guilty to "Count No. 1 . . . murder in the first degree."[7] Mr. Tate admitted to reading the charging document, discussing the charges with his counsel, and understanding the charges and to what he was pleading guilty. In addition, Mr. Tate could have raised an objection to the statement of facts if he disagreed with them, but instead he decided against doing so. In opting not to do so, Mr. Tate agreed that he had committed first-degree murder. Clearly, the statement of facts can be reasonably interpreted as the factual basis to support the elements of premeditated first-degree murder and not felony murder. The State emphasized that it had witness statements related to Mr. Tate's intent and preconceived plan to murder the victim, as opposed to emphasizing evidence of Mr. Tate committing robbery or any other specific felony. The facts were not

---

[7] The first count in the indictment stated: "The GRAND JURY charges that the aforesaid defendant, on or about the aforesaid date, feloniously, wilfully, and of deliberately premeditated malice aforethought did kill and murder Jerry Lee Haines."

23

framed in such a way that the State could have proven Mr. Tate committed felony murder. Therefore, the facts underscore the nature and elements of the crime of first-degree murder, namely premeditation and deliberation.

Mr. Tate proposes that this Court consider establishing a rule where, for juveniles particularly, the elements and nature of the charges are explained on the record in non-legal language such that the hearing judge can ensure that the defendant understands the nature of the charge. At this time, we do not adopt this rule. The case law does not support the adoption of this rule, and in particular, the *Daughtry* opinion does not support the adoption of this rule either. Although *Daughtry* held, in part, that first-degree murder was complex, *Daughtry* did not depart from prior case law. There is no constitutional requirement that there must be a recitation of the particular elements of the charged crime on the record at the plea hearing. *See Bradshaw v. Stumpf*, 545 U.S. 175, 188, 125 S. Ct. 2398, 2405, 162 L. Ed. 2d 143, 153 (2005) ("[W]e have never held that the judge must himself explain the elements of each charge to the defendant on the record. Rather, the constitutional prerequisites of a valid plea *may be satisfied* where the record accurately reflects that the nature of the charge and the elements of the crime were explained to the defendant by his [or her] own, competent counsel.") (emphasis added); *Lovell v. State*, 347 Md. 623, 634, 702 A.2d 261, 266 (1997) ("[R]ecital of the elements of the crime is not required."); *Gross v. State*, 186 Md. App. 320, 351, 973 A.2d 895, 913 (2009) ("We hold that when a defendant, in response to questioning by the court, says on the record that he has discussed the elements of the crime to which he is pleading guilty with his attorney, that representation is sufficient to show that the plea was knowingly entered.").

24

## IV.

In the case at bar, the hearing judge in reopening the postconviction proceedings relied on *Daughtry* as the appropriate standard of review for Mr. Tate's postconviction case, and in doing so, committed legal error. The postconviction court applied the following standard: "Whether, considering the record as a whole, the trial judge could fairly determine that the defendant understood the nature of the charge to which he pleaded guilty." *Daughtry*, 419 Md. at 79–80, 18 A.3d at 86–87 (quoting *State v. Priet*, 289 Md. 267, 291, 424 A.2d 349, 361 (1981)). The hearing judge overlooked the critical procedural difference between *Daughtry* and Mr. Tate's case; *Daughtry* involved an appeal of a conviction following a guilty plea, whereas Mr. Tate's case began as a collateral attack on his guilty plea via a request for postconviction relief. In order to better understand this misstep, we shall give a full exposition of *Daughtry*. Then, we shall distinguish the two cases to explain further how the postconviction court misapplied *Daughtry* in reopening the postconviction case.

### *The Law in* Daughtry

Police officers in Prince George's County apprehended Mr. Daughtry when they responded to a reported shooting. *Id.* at 43, 18 A.3d at 64. Mr. Daughtry admitted that he was meeting with Mr. Ashton who had agreed to commit a robbery with Mr. Daughtry. *Id.* At the time of the robbery, Mr. Ashton engaged in an altercation with the victim, and Mr. Daughtry shot the victim. *Id.* at 43, 18 A.3d at 65. Mr. Daughtry negotiated a plea bargain in which he agreed to plead guilty to first-degree murder and use of a handgun in the

25

commission of a felony or a crime of violence, and he agreed to assist in the prosecution of Mr. Ashton. In exchange for his guilty plea and cooperation, Mr. Daughtry received a life sentence with all but thirty years suspended. *Id.* at 44, 18 A.3d at 65.

During the plea hearing, the judge preliminarily asked for Mr. Daughtry's name, age, the last grade in school he completed, and whether he could read, write, and understand the English language, all of which Mr. Daughtry answered in the affirmative. *Id.* Next, the hearing judge asked if he had discussed the plea with his attorney, to which Mr. Daughtry replied that he had. *Id.* Lastly, the hearing judge asked if the plea was Mr. Daughtry's decision, to which Mr. Daughtry replied affirmatively. *Id.* The hearing judge then accepted the terms of the agreement. *Id.* After entry of the conviction and sentence, Mr. Daughtry applied for leave to appeal to the Court of Special Appeals which vacated the conviction in an unreported opinion. *Id.* at 45, 18 A.3d at 66.

This Court affirmed the Court of Special Appeals. *Id.* at 45–46, 18 A.3d at 66. We began our analysis in *Daughtry* with the State's concession that Mr. Daughtry had entered the guilty plea ignorant of the charge to which he pleaded guilty. *Id.* at 66–67, 18 A.3d at 79. The Court reasoned that the only way to conclude that Mr. Daughtry "was informed of the nature and elements of first[-]degree murder" was to presume it from the fact that he had the benefit of legal counsel. *Id.* at 68, 18 A.3d at 80. The Court recognized that, in light of the development of the United States Supreme Court's jurisprudence, and in particular the *Bradshaw* opinion, the presumption that counsel explains the nature of the charges to the defendant remained viable. *Id.* Yet, under the totality of the particular circumstances confronting the Court of Appeals in *Daughtry*, the Court determined that the

26

plea must be vacated. *Id*. at 69, 18 A.3d at 80. We assessed that the only evidence to show Mr. Daughtry's awareness of the nature of the charges was that he was represented by counsel and had discussed his plea with his attorney. *Id*. at 69–70, 18 A.3d at 80–81. To permit "an otherwise bare record" as an adequate demonstration of Mr. Daughtry's knowledge of the charges would undermine the purpose of the totality of the circumstances test. *Id*. at 69, 18 A.3d at 80.

The Court in *Daughtry* relied on Maryland Rule 4-242(c) to bolster its decision. Although the Rule itself does not prescribe any particular litany for the plea hearing judge to follow in order for a guilty plea to comply with the Rule, it does require an examination on the record in open court. Md. Rule 4-242(c); *see also Daughtry*, 419 Md. at 71, 18 A.3d at 81. We explained that to permit a presumption that because a defendant has representation he or she understands the charges against him or her "would encourage trial courts to circumvent or give short-shrift to the Rule's requirement[.]" *Daughtry*, 419 Md. at 71, 18 A.3d at 81. The Court concluded:

> Therefore, we hold that, regarding the issue of the defendant being made aware of the nature of the charges against him, where the record reflects nothing more than the fact that a defendant is represented by counsel (as in the present case) and that the defendant discussed generically the plea with his or her attorney, such a plea colloquy is deficient under Rule 4-242(c), and the plea must be vacated.

*Id*.

The Court provided guidance to hearing judges for "determining whether to accept a guilty plea." *Id*. at 72, 18 A.3d at 82. We pointed out that, although circumstances must be assessed on a case-by-case basis, *Priet* suggested looking at "*the complexity of the*

*charge, the personal characteristics of the accused, and the factual basis proffered to support the court's acceptance of the plea.*"  *Id*. (quoting *State v. Priet*, 289 Md. 267, 277, 424 A.2d 349, 354 (1981).  In its analysis of the meaning of the complexity of the charge, the Court stated that "the nature of 'first-degree murder' is not readily understandable from the label of the crime itself."  *Id*. at 72–73, 18 A.3d at 82.  When this Court explained the personal characteristics of the defendant, the Court explicated that "one with a diminished mental capacity is less likely to be able to understand the nature of the charges against him [or her] than one with normal mental faculties."  *Id*. at 73, 18 A.3d at 83.  Finally, the Court stated that "it is possible that the factual basis proffered to support the court's acceptance of the plea may describe the offenses charged in sufficient detail to pass muster under the Rule."  *Id*. at 74, 18 A.3d at 83 (internal quotation marks omitted).  The Rule permits evidence of a knowing and voluntary plea to come from any source so long as it is on the record.  Md. Rule 4-242(c); *see Daughtry*, 419 Md. at 74, 18 A.3d at 83.

*The Reasoning of the Postconviction Hearing Judge*

In the instant case, the postconviction hearing judge misapplied *Daughtry* to Mr. Tate's postconviction case and vacated Mr. Tate's guilty plea, reasoning that "neither the plea judge [n]or trial counsel ever explained the nature or the elements of the offense of premeditated first-degree murder and its particular complexities, [as addressed in *Daughtry*], in express terms at the plea hearing."  The hearing judge explained that there was neither an explanation of the nature of the charge nor the specification of the intent required on the record at the plea hearing.  Notably, the hearing judge repeatedly

28

emphasized that the explanation did not occur *on the record*, explicitly citing to the *Daughtry* opinion.

The postconviction hearing judge failed to appreciate the significance of the procedural posture of *Daughtry*. Mr. Daughtry appealed his conviction after entry of his guilty plea. 419 Md. at 44, 18 A.3d at 65. Accordingly, appellate review of his plea was limited to the record developed at the plea hearing. *Id*. at 54, 18 A.3d at 71 (explaining that review was limited to "considering the record as a whole, [whether] the trial judge could fairly determine that the defendant understood the nature of the charge to which he pleaded guilty") (quoting *State v. Priet*, 289 Md. 267, 291, 424 A.2d 349, 361(1981)).

Importantly, *Daughtry* does not apply when a postconviction hearing judge reviews a guilty plea in the collateral review context. *See Smith*, 443 Md. at 653, 177 A.3d at 1141 (emphasizing that *Daughtry*'s holding applies only to an appeal of a conviction after a plea). The *Smith* Court explained that the purpose of an appeal of a conviction after a plea is to determine "what the trial court could find, and that issue is necessarily limited to what happened at the plea hearing." *Id*. In *State v. Rich*, we again affirmed the limited application of *Daughtry* to appeals of convictions following the entry of guilty pleas. 454 Md. at 464, 164 A.3d at 364–65 (explaining that an appellate court in the review of a conviction following a guilty plea "is limited to the record of the plea hearing itself" as opposed to a hearing court that determines the appropriateness of postconviction relief in light of alleged errors with a guilty plea). We reaffirm *Smith* and *Rich* to the extent that *Daughtry* applies only in circumstances where a defendant appeals his or her conviction following the entry of a guilty plea.

29

In contrast to *Daughtry*, Mr. Tate sought review of his conviction when he initiated the collateral review process. He filed a petition for postconviction relief in 2006 and alleged both that his plea was defective and that his counsel was ineffective. *See, e.g., Mosley v. State*, 378 Md. 548, 559, 836 A.2d 678, 684 n.5 (2003) (explaining that a postconviction proceeding is one vehicle for obtaining collateral review of a conviction). The hearing judge denied Mr. Tate's petition on the basis of the voluntariness of his plea but granted relief on the grounds of ineffective assistance of counsel. The postconviction court granted Mr. Tate's belated request for review by a three-judge panel which subsequently denied his application for review of sentence. Thereafter, Mr. Tate sought to reopen his postconviction case in 2011 under Crim. Proc. § 7-104 for the court to review the voluntariness of his guilty plea, this time relying on our decision in *Daughtry*. When the postconviction court granted the motion to reopen, Mr. Tate obtained further review of his postconviction matter. As we will explain in Part V of this opinion, the additional collateral review was not in the interests of justice and was, therefore, unwarranted.

## V.

Because the hearing judge misapplied *Daughtry*, we raise the question whether, in the absence of applying *Daughtry*, the hearing judge should have reopened Mr. Tate's postconviction case.[8] This question is inextricably linked with the outcome of this case.

---

[8] Mr. Tate contends that this argument is not preserved because the State did not raise the argument before the Court of Special Appeals. Notwithstanding, the only reason the Circuit Court vacated Mr. Tate's guilty plea is because the postconviction hearing judge errantly interpreted *Daughtry*. In order to rectify any uncertainty surrounding the *Daughtry* decision's impact on our jurisprudence, we address the postconviction hearing judge's decision to reopen Mr. Tate's postconviction case.

As we shall explain, the hearing judge abused his discretion when he reopened Mr. Tate's postconviction case on the basis of the *Daughtry* opinion, but, even in the absence of applying *Daughtry*, Mr. Tate's case should not have been reopened.

*Reopening Postconviction Proceedings*

Under certain circumstances, a court has discretion to reopen a postconviction proceeding. According to Crim. Proc. § 7-104, "The court may reopen a postconviction proceeding that was previously concluded if the court determines that the action is in the interests of justice." As the Criminal Procedure Article affords discretion to a court to reopen a postconviction matter, appellate courts review the decision for an abuse of discretion. *Gray v. State*, 388 Md. 366, 383, 879 A.2d 1064, 1073 (2005). Accordingly, "[s]o long as the hearing judge exercises his or her discretion reasonably, an appellate court will not reverse the judgment under review." *Christian v. Maternal-Fetal Medicine Associates*, _ Md. _, _ A.3d _ (2018) (citing *University of Maryland Medical System Corp. v. Kerrigan*, 456 Md. 393, 401, 174 A.3d 351, 356 (2017)).

Our cases outline what may fall within the "interests of justice" pursuant to Crim. Proc. § 7-104. "The list of possible grounds" for reopening postconviction proceedings "is virtually open-ended." *Love v. State*, 95 Md. App. 420, 427, 621 A.2d 910, 914 (1993). The discretion afforded to postconviction courts has long been recognized. *See State v. Adams-Bey*, 449 Md. 690, 701, 144 A.3d 1200, 1207 (2016). Two examples of the interests of justice that may compel reopening postconviction cases include "ineffective assistance of postconviction counsel or a change made in the law that should be applied retroactively." *Gray*, 388 Md. at 382–83, 879 A.2d at 1073 n.7; *see also Harris v. State*, 160 Md. App.

31

78, 98, 862 A.2d 516, 528 (2014) ("The [Uniform Postconviction Procedure Act] was created *in part* to provide a forum for litigating ineffective assistance of counsel claims.") (emphasis added). Advisory jury instructions, lawful at the time of trial but since determined to be unconstitutional, have also been deemed contrary to the interests of justice due to changes in the law. *Adams-Bey*, 449 Md. at 705, 144 A.3d at 1209.

Here, the basis for reopening Mr. Tate's postconviction case, according to the hearing judge, was not ineffective assistance of postconviction counsel or even, necessarily, a change made in the law. Instead, the hearing judge believed that *Daughtry* established law that was not necessarily new but nonetheless required retroactive application. In his order to vacate the guilty plea, the hearing judge explained:

> This Court notes Tate purports *Daughtry* to be a change in the law. That is true in [an] overall sense, but, in a more technical legal sense it is not, since the Court of Appeals ruled it had to be applied retroactively because it did not ultimately change applicable guilty plea law. Nevertheless, it is clear it must ultimately be given its retroactive applicability and, thus, requires that this Petitioner's Post-Conviction proceedings be reopened in the interests of justice, the plea and sentence vacated, and a new trial granted based on the legal standards just noted, as well as other reasons set forth herein.

On its face, this reasoning does not survive our scrutiny. In 2009, after Mr. Tate initially sought postconviction relief, the hearing judge upheld Mr. Tate's guilty plea as valid. Based on that outcome, the interests of justice could not have compelled the postconviction hearing judge to reopen the matter. Notwithstanding, if *Daughtry* did not alter our jurisprudence, as the postconviction hearing judge himself acknowledged in September 2014, then the interests of justice could not have compelled the hearing judge to reopen the matter on the basis of a change in the law. *See Gray*, 388 Md. at 382–83, 879 A.2d at 1073

32

n.7. Although we agree that *Daughtry* did not establish new law, we, nevertheless, endeavor to determine if an alleged lack of explanation of the nature of first-degree murder justified reopening Mr. Tate's postconviction case independent of the postconviction hearing judge's reasoning.

*Understanding the Nature of the Offense Pre-*Daughtry

The United States Supreme Court has established that when a defendant has representation, defense counsel will routinely explain the charges sufficiently for the accused to plead guilty. *Henderson v. Morgan*, 426 U.S. 637, 638, 96 S. Ct. 2253, 2254, 49 L. Ed. 2d 108, 108 (1976). Mr. Morgan pleaded guilty to second-degree murder and later challenged the voluntariness of the guilty plea. *Id.* at 638–39, 96 S. Ct. at 2254–55, 49 L. Ed. 2d at 111. He was initially unsuccessful at the state appellate court level as well as in the federal district court. *Id.* at 639, 96 S. Ct. at 2255, 49 L. Ed. 2d at 111. Upon review by the Court of Appeals for the Second Circuit, however, the Second Circuit reversed and remanded for factfinding on whether the defendant knew of the intent element of second-degree murder. *Id.* The District Court found that he did not and set aside the guilty plea, which the Second Circuit affirmed. *Id.* at 640–641, 96 S. Ct. at 2255–56, 49 L. Ed. 2d at 112.

The United States Supreme Court affirmed. First, the Court pointed out that determining the voluntariness of a guilty plea required evaluating the totality of the circumstances. *See id.* at 644, 96 S. Ct. at 2257, 49 L. Ed. 2d at 114. The Supreme Court explained that the stipulation by defense counsel to the requisite intent would have been sufficient, but there was no explanation that the plea would be considered an admission of

33

fact, and there was no statement in the plea that Mr. Morgan had the requisite intent. *Id*. at 646, 96 S. Ct. at 2258, 49 L. Ed. 2d at 115. Nothing from the facts admitted necessitated the conclusion that Mr. Morgan intended to commit homicide. *Id.* at 645–46, 96 S. Ct. at 2258, 49 L. Ed. 2d at 114–15. The Supreme Court suggested that, typically, records will contain the hearing judge's explanation of the charge or affirmation by the defendant's counsel that he or she explained to the defendant the nature of the charges. *Id*. at 647, 96 S. Ct. at 2258, 49 L. Ed. 2d at 115. "Moreover, even without such an express representation, it may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit." *Id*. at 647, 96 S. Ct. at 2258, 49 L. Ed. 2d at 115–16.

This Court had the opportunity to interpret *Henderson* in *State v. Priet*, 289 Md. 267, 424 A.2d 349 (1981). *Priet* presented the Court with three consolidated cases which challenged the voluntariness of guilty pleas entered by the various defendants. *Id.* at 268–69, 424 A.2d at 350. The Court of Special Appeals vacated each of the guilty pleas because the record failed to demonstrate that the defendants understood the "nature of the offense" to which they had pleaded guilty. *Id*. at 271, 273, 274, 424 A.2d at 351, 352, 353.

The *Priet* Court reversed the Court of Special Appeals and held that no "ritualistic or fixed procedure" was required in order for a plea to be considered valid. *Id*. at 288, 424 A.2d at 359. The determination of whether a guilty plea is made knowingly and voluntarily "must be [made] on a case-by-case basis, taking into account the relevant circumstances in their totality as disclosed by the record, including, among other factors, the complexity of the charge, the personal characteristics of the accused, and the factual basis proffered to

34

support the court's acceptance of the plea." *Id*. at 288, 424 A.2d at 360. The Court held that the guilty pleas in the consolidated cases before it were adequate; each defendant had received questioning at length regarding the voluntariness of the plea, and each defendant had been told of both the penalties for the offenses and the constitutional rights each would waive by pleading guilty. *Id*. at 290, 424 A.2d at 361. Each defendant had acknowledged discussing with his attorney the case and the guilty plea, and that discussion was the only basis the court had for concluding the defendants understood the nature of the charges. *Id.* Yet, the *Priet* Court held that the totality of the circumstances demonstrated the knowing and voluntary nature of the guilty pleas. *Id*. at 290–291, 424 A.2d at 361.

The *Priet* Court explained that *Henderson* did not compel a different conclusion. Nothing about *Henderson* required "a formal recitation of the elements of the offense." *Id.* at 288, 424 A.2d at 360. Along with holding that *Henderson* required no particular words spoken on the record to prove the knowing and voluntary nature of a guilty plea, the *Priet* Court also assessed that "unless the contrary clearly appears from the record (as was true in *Henderson*), 'it may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he [or she] is being asked to admit.'" *Id*. at 290, 424 A.2d at 361 (quoting *Henderson v. Morgan*, 424 U.S. 637, 647, 96 S. Ct. 2253, 2258–59, L. Ed. 2d, 108, 115–16 (1976)).

The United States Supreme Court has since revisited, and affirmed, its holding in *Henderson* in *Bradshaw v. Stumpf*, 545 U.S. 175, 125 S. Ct. 2398, 162 L. Ed. 2d 143 (2005). Mr. Stumpf pleaded guilty to murder and attempted murder, but when new evidence emerged that his co-conspirator had actually committed the murder, the defendant

35

moved to vacate his sentence. *Id*. at 181, 125 S. Ct. at 2404, 162 L. Ed. 2d at 152. The United States Court of Appeals for the Sixth Circuit vacated Mr. Stumpf's guilty plea because the Sixth Circuit determined that Mr. Stumpf did not understand the specific intent element of aggravated murder. *Id*. at 181–82, 125 S. Ct. at 2404–05, 162 L. Ed. 2d at 152. Therefore, his guilty plea could not have been knowingly and voluntarily entered. *Id*.

However, the United States Supreme Court reversed the judgment of the Sixth Circuit and remanded for additional consideration of a second issue not related to the guilty plea. *Id*. at 183, 188, 125 S. Ct. at 2405–06, 2408, 162 L. Ed. 2d at 156. The Supreme Court determined that Mr. Stumpf had been properly informed of the nature of his charges because the record contained an explanation that Mr. Stumpf's attorney had explained the nature of the charges to him. *Id*. at 188, 125 S. Ct. at 2405, 2408, 162 L. Ed. 2d at 153. Citing *Henderson*, the Supreme Court declared that such guarantees from defense counsel are typically adequate to meet constitutional muster. *Id.* at 183, 125 S. Ct. at 2406, 162 L. Ed. 2d at 154 ("Where a defendant is represented by competent counsel, the court usually may rely on that counsel's assurance that the defendant has been properly informed of the nature and elements of the charge to which he [or she] is pleading guilty.").

*The Daughtry Case*

Notably, *Daughtry* offered significant guidance for resolving whether it constituted a departure from pre-existing case law with respect to a defendant's understanding of the nature of the offense to which he or she pleaded guilty. The *Daughtry* Court addressed the future application of its opinion and highlighted that its decision did not constitute a departure from our jurisprudence at the time. *Daughtry*, 419 Md. at 79, 18 A.3d at 86

36

("Our decision in the present case in no way overrules prior law [or] declares a new principle of law.") (internal quotation marks omitted). The Court emphasized that the law had not changed in the past thirty years, since at least the *Priet* decision, and that the standard as applied to the voluntariness of guilty pleas was still a totality of the circumstances approach. *Id.* at 79–80, 18 A.3d at 86–87. Because *Daughtry* did not offer a departure from where the law stood, it would apply retroactively. *Id.* at 81, 18 A.3d at 87; *see Walker v. State*, 343 Md. 629, 637, 684 A.2d 429, 432–33 (1996) (explaining that the standard for prospective or retrospective application of a judicial decision turns on whether "the decision overrules prior law and declares a new principle of law. If a decision does not [overrule prior law and declare a new principle of law] . . . no question of a 'prospective only' application arises; the decision applies retroactively in the same manner as most court decisions").[9]

### Collateral Review of Guilty Pleas

After *Daughtry*, this Court had occasion to address the validity of guilty pleas in the collateral review context in *State v. Smith*, 443 Md. 572, 117 A.3d 1093 (2015). Ms. Smith pleaded guilty in 2003 to a charge of conspiracy to distribute marijuana, and in 2013 she filed for *coram nobis* relief, alleging that her guilty plea was not knowingly and voluntarily

---

[9] The *Daughtry* Court anticipated the importance of retroactive application of the *Daughtry* opinion in cases where the *Henderson/Priet* presumption alone—that a defendant had an attorney and therefore understood the nature of the charges against him or her—was the only basis showing that a defendant entered a plea knowingly and voluntarily. *State v. Daughtry*, 419 Md. 35, 80, 18 A.3d 60, 87 (2011). In Mr. Tate's case, it cannot be said that the only basis for acceptance of the guilty plea was the *Henderson/Priet* presumption, and therefore, *Daughtry's* retroactive application could not justify reopening Mr. Tate's postconviction proceedings.

37

entered. *Id.* at 577, 177 A.3d at 1096–97. The Circuit Court denied Ms. Smith's request for relief, but the Court of Special Appeals reversed on the basis that the guilty plea was invalid. *Id.* at 578, 177 A.3d at 1097.

The Court of Appeals reversed the intermediate appellate court and affirmed the judgment of the Circuit Court. *Id.* at 622, 177 A.3d at 1123. This Court decided that Ms. Smith's guilty plea was entered knowingly and voluntarily, basing its determination on the proper admission at the *coram nobis* hearing of testimony from Ms. Smith's counsel regarding the advisement of Ms. Smith at the plea hearing. *Id.* at 649, 177 A.3d at 1138–39. The *Smith* Court distinguished *Daughtry* from the facts before it based on the procedural posture of the two cases, holding that the standard of review in appeals of convictions following guilty pleas differs from the standard following collateral review of a guilty plea in a *coram nobis* proceeding:

> This distinction is vital, as in a *coram nobis* case such as this one, the only issue is whether the defendant understood the nature of the charges—*regardless* of whether the trial court could determine as much. By contrast, in an appeal of a conviction after a plea such as the one in *Daughtry*, the ultimate issue depends on what the trial court could find, and that issue is necessarily limited to what happened at the plea hearing, which includes the entirety of what the trial court could find.

*Id.* at 653, 177 A.3d at 1141 (cleaned up). The distinction in the procedural posture of Ms. Smith's case was dispositive of the outcome. The testimony at the *coram nobis* hearing revealed that Ms. Smith's attorney advised her of the charges prior to her guilty plea, and when considered with the totality of the circumstances, Ms. Smith knowingly and voluntarily entered her guilty plea. *Id.* at 654–55, 177 A.3d at 1141–42.

38

Most recently, this Court further clarified its guilty plea jurisprudence in *State v. Rich*, 454 Md. 448, 164 A.3d 355 (2017). Mr. Rich filed for *coram nobis* relief after he pleaded guilty to conspiracy to distribute marijuana, and the Circuit Court denied Mr. Rich's request for relief without a hearing. *Id.* at 451, 164 A.3d at 357. Mr. Rich appealed the Circuit Court's denial, and the Court of Special Appeals reversed. *Id.* at 452, 164 A.3d at 357. The Court of Special Appeals first held that Mr. Rich had not waived his right to *coram nobis* relief when he failed to seek application for leave to appeal his conviction following his guilty plea, and, next, held that Mr. Rich's guilty plea was not knowing and voluntary. *Id.* at 452, 164 A.3d at 357–58.

The Court of Appeals reaffirmed the distinction in standards of review based upon the procedural posture of the case:

> [W]hen challenging a guilty plea on [application for leave to appeal a conviction following a guilty plea], the reviewing court is limited to the record of the plea hearing itself. But, when challenging a guilty plea through a petition for writ of error *coram nobis*, the *coram nobis* court may consider additional evidence, such as the trial lawyer's testimony regarding his or her conversations with the defendant explaining the terms of the plea, in addition to the record of the plea hearing itself.

*Id.* at 464, 164 A.3d at 364–65. The distinction enables a *coram nobis* hearing judge to consider evidence outside the plea hearing record to include whatever additional evidence may exist subsequent to the plea hearing that demonstrates the knowing and voluntary nature of the guilty plea; whereas, on appeal of a conviction following a guilty plea, a reviewing court is limited exclusively to an examination of the record from the guilty plea hearing. *Id.* at 464, 164 A.3d at 365. The State had limited evidence to demonstrate that Mr. Rich pleaded guilty knowingly and voluntarily due to the lack of a hearing which,

39

ironically, the Circuit Court failed to hold because the State requested that no hearing occur. *Id.* at 467, 164 A.3d at 366. We ultimately upheld the Court of Special Appeals decision to vacate the guilty plea because, upon review of the evidence before it, Mr. Rich did not enter his guilty plea knowingly and voluntarily.

Daughtry *Did Not Alter the Interests of Justice Analysis*

In the case at bar, the postconviction hearing judge determined that *Daughtry* tilted the interests of justice in favor of reopening Mr. Tate's postconviction case. Upon our review of Maryland's guilty plea jurisprudence, *Daughtry* did not alter the law as it stood. The intent of this Court in *Daughtry* was merely to clarify the law and not change it. 419 Md. at 79–80, 18 A.3d at 86–87 ("Our decision in the present case in no way overrules prior law and declares a new principle of law.") (internal quotation marks omitted). The *Daughtry* Court exerted scrupulous effort to detail the development of the law, beginning with *Henderson*, *see id.* at 47, 18 A.3d at 67, and Maryland Rule 731(c), predecessor to Md. Rule 4-242, *see id.* at 50, 18 A.3d at 69, to *Priet*, *see id.* at 52, 18 A.3d at 70, to *Bradshaw*, *see id.* at 58, 18 A.3d at 74, to lastly three post-*Bradshaw* Court of Special Appeals cases, *see id.* at 61, 62, 65, 18 A.3d at 75, 76, 78. Upon its own review of over thirty years of legal developments, the *Daughtry* Court announced that the "law of this State with respect to the voluntariness of guilty pleas has been the same over the past thirty years since we decided *Priet*[,] if not longer . . . . Today, we reaffirm this 'totality of the circumstances' approach to determining the voluntariness of guilty pleas." *Id.* at 79–80, 18 A.3d at 86–87. The *Daughtry* Court considered its decision "consistent entirely with Rule 4-242(c), its predecessor, and attendant case [] law." *Id.* at 80, 18 A.3d at 87.

40

The act of the hearing judge in the present case to reopen Mr. Tate's postconviction proceeding in order to apply *Daughtry* was an abuse of his discretion.  Although *Daughtry* applies retroactively, nothing about the case altered the horizon of legal possibilities for Mr. Tate.  The *Henderson* presumption, which we adopted in *Priet* ("*Henderson/Priet* presumption"), continues to exist after *Daughtry*.  *Id.* at 68, 18 A.3d at 80.  The applicable standard to determine the validity of guilty pleas continues to be a case-by-case assessment of whether the guilty plea is knowing and voluntary, as it was applied during Mr. Tate's guilty plea hearing.  *Id.* at 69, 18 A.3d at 80.  Although *Daughtry* did discuss, albeit in dicta, that the nature of first-degree murder is not readily understandable from the crime itself, *Daughtry* held that it is but one aspect of the circumstances for a court to consider. *Id.* at 72–74, 18 A.3d at 82–83.

The hearing judge misinterpreted *Daughtry* when he concluded that *Daughtry* ended the *Henderson/Priet* presumption.  The *Henderson/Priet* presumption consists of the notion that ordinarily, "defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he [or she] is being asked to admit." *Priet*, 289 Md. at 290, 424 A.2d at 361 (quoting *Henderson v. Morgan*, 426 U.S. 637, 647, 96 S. Ct. 2253, 2259, 49 L. Ed. 2d 112, 116 (1976)).  If the *Daughtry* Court truly ended the presumption, it could not and would not have claimed that the case did not change pre-existing law.  419 Md. at 79, 18 A.3d at 86.  In fact, the Court stated, the "viability of the *Henderson/Priet* presumption remains intact[.]"  *Id.* at 69, 18 A.3d at 80.  Merely because the *Daughtry* Court did not apply the presumption based on the facts of the case did not mean that *Daughtry* sounded the "death knell for the *Henderson/Priet* presumption."  *Id.*

41

at 76, 18 A.3d at 84 ("We are not sounding the death knell for the *Henderson/Priet* presumption.").

The postconviction hearing judge justified his disregard for the *Henderson/Priet* presumption on the additional basis that, like in *Daughtry*, the record was so "anemic" as to require disregarding it. The plea hearing in *Daughtry* was considered deficient because the only pertinent question the hearing court asked Mr. Daughtry was *whether he had discussed his plea* with his lawyer. *Id.* at 44, 18 A.3d at 65. In comparison to the plea colloquy in *Daughtry*, what occurred on the record at Mr. Tate's plea hearing resembles the gold standard; if anything, the presumption would apply in Mr. Tate's case but for the fact that the record alone is adequate for purposes of determining the validity of the guilty plea. Mr. Tate affirmed, on the record, that he had received a copy of the charges, that he read the charges, that he had discussed the charges with his attorney, that he understood the charges, that he understood what he was pleading guilty to, that he told his attorneys all the facts about the case, that they told him what he could do in court, and that they had done everything they could in his defense.

Focusing solely on what Mr. Daughtry actually said, we concluded that Mr. Daughtry never affirmed that he read, discussed, or understood the charges. It is entirely possible, as suggested by the *Daughtry* Court, that Mr. Daughtry understood the terms of the guilty plea but nothing of the nature of the charges to which he pleaded guilty. *Id.* at 75, 18 A.3d at 84. To analogize the two cases ignores how bare the record in *Daughtry* truly was. The presumption that counsel had discussed with Mr. Daughtry the nature of the charges against him was rebutted by the record itself due to the lack of a "factual basis

42

in the record to support [the presumption]." *Id.* at 76, 18 A.3d at 84 (quoting *Hicks v. Franklin*, 546 F.3d 1279, 1284 (10th Cir. 2008)). In the case at bar, the postconviction hearing judge should not have disregarded the *Henderson/Priet* presumption as a part of our jurisprudence and as it would apply to Mr. Tate's case, even after the *Daughtry* opinion.

The postconviction hearing judge also misinterpreted *Daughtry* when he concluded that *Daughtry* discussed how much weight he needed to give to certain facts. The hearing judge explained that what distinguished the outcome of Mr. Tate's second attempt at postconviction relief from the first resided in the diminished weight the hearing judge afforded to the evidence outside the plea hearing record. Additionally, the hearing judge reconsidered Mr. Tate's personal characteristics with "added weight" when said characteristics militated against the knowing and voluntary nature of his guilty plea. *Daughtry*, however, does not discuss the weight afforded to evidence on the record versus extrinsic evidence.[10] In the instant case, no new evidence was presented to the hearing

---

[10] The only passage from *Daughtry* that the hearing judge could have referenced with regard to "additional weight" for the personal characteristics of the accused is as follows:

> Instead of merely informing practitioners and judges what conduct merely will *not* pass muster under Rule 4-242(c) (*i.e.* the mere fact of representation alone and that the defendant discussed the plea with his or her attorney), we shall elaborate somewhat on what factors can and should aid a trial court in determining whether to accept a guilty plea. *Priet* provided a starting point, when we stated that "the required determination can only be made on a case-by-case basis, taking into account . . . among other factors, *the complexity of the charge, the personal characteristics of the accused, and the factual basis proffered to support the court's acceptance of the plea*.

*State v. Daughtry*, 419 Md. 35, 72, 18 A.3d 60, 82 (2011) (quoting *Priet*, 289 Md. 267, 277, 424 A.2d 349, 354 (1981)). The *Daughtry* Court discussed each factor in turn and

(continued . . .)

judge that he had not previously considered at the postconviction hearing. The only difference between the two hearings was the court's consideration of the *Daughtry* opinion. Therefore, the hearing judge should not have afforded additional weight as a matter of law to Mr. Tate's personal characteristics, and in particular his age and alleged diminished mental capacity. The legal standard for cases on appeal following conviction after a guilty plea continues to be, after *Daughtry*, whether the plea court could have found, under the totality of the circumstances considering the entirety of that record, that the defendant entered into the guilty plea knowingly and voluntarily. *Daughtry*, 419 Md. at 71, 18 A.3d at 81; Md. Rule 4-242(c).

## VI.

In conclusion, the postconviction hearing judge erred when he misapplied *Daughtry* to the facts of Mr. Tate's case and abused his discretion when he reopened Mr. Tate's postconviction matter. The totality of the circumstances based on the record from the plea hearing alone demonstrated the knowing and voluntary nature of Mr. Tate's guilty plea.

---

(. . . continued)
stated that "the personal characteristics of the accused are important, as one with a diminished mental capacity is less likely to be able to understand the nature of the charges against him than one with normal mental faculties." *Id.* at 73, 18 A.3d at 83 (internal quotation marks omitted) (citing *Henderson v. Morgan*, 246 U.S. 637, 641, 96 S. Ct. 2253, 2256, 49 L. Ed. 2d 112, 112 (1976)). The statement that the Court made regarding the importance of considering diminished mental capacity refers to the necessity with which the Court may consider it as a factor, not that it receives "additional weight." In *Henderson v. Morgan*, Mr. Morgan's "unusually low mental capacity," when weighed with the totality of the circumstances, required vacating the guilty plea as unknowing and involuntary. 246 U.S. 637, 647, 96 S. Ct. 2253, 2259, 49 L. Ed. 2d 112, 116 (1976). No such comparable facts were before Mr. Tate's postconviction hearing judge, on the record or otherwise; nonetheless, the hearing judge did consider Mr. Tate's personal characteristics when he assessed whether Mr. Tate entered his guilty plea knowingly and voluntarily.

44

The plea court had enough evidence before it to find that Mr. Tate knowingly and voluntarily entered his guilty plea to first-degree murder. The postconviction hearing judge premised his decision to reopen as well as his decision to vacate on the basis of the *Daughtry* case. *Daughtry*, however, involved review after the entry of a guilty plea and not collateral review after the entry of a guilty plea. *See Smith*, 443 Md. at 653, 177 A.3d at 1141. It is equally clear that the *Daughtry* Court did not intend to depart from pre-existing law. 419 Md. at 79, 18 A.3d at 86. When the postconviction hearing judge reopened the postconviction proceedings for the reasons alleged, Mr. Tate received a second bite at the apple, a bite which he was not entitled to receive.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**